HINKLE LAW FIRM, LLC
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206-6639
316-267-2000 / 316-264-1518 fax

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE:<br><br>A-OK ENTERPRISES, LLC<br><br>          Debtor(s) | Case No. 17-10096<br>Chapter 11 |
| IN RE:<br><br>A-OK 1, LLC<br><br>          Debtor(s) | Case No. 17-11098<br>Chapter 11 |
| IN RE:<br><br>A-OK 2, LLC<br><br>          Debtor(s) | Case No. 17-11099<br>Chapter 11 |
| IN RE:<br><br>A-OK 3, LLC<br><br>          Debtor(s) | Case No. 17-11100<br>Chapter 11 |
| IN RE:<br><br>A-OK, INC.<br><br>          Debtor(s) | Case No. 17-11097<br>Chapter 11 |

## STIPULATED MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO SIMMONS BANK, SUCCESSOR BY CONVERSION TO SIMMONS FIRST NATIONAL BANK

COME NOW the debtors, A-OK Enterprises, LLC, a Kansas limited liability company;

A-OK 1, LLC, a Kansas limited liability company; A-OK 2, LLC, a Kansas limited liability

company; A-OK3, LLC, a Kansas limited liability company; and A-OK, Inc., a Kansas

In the United States Bankruptcy Court for the District of Kansas
IN RE:    A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
          Bankruptcy Case No.
          Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
          Bank, Successor by Conversion to Simmons First National Bank
Page 2

corporation, (the "Debtors") and Simmons Bank, successor by conversion to Simmons First National Bank ("Simmons Bank") hereby move the Court for an order authorizing the use of cash collateral and granting adequate protection to Simmons Bank.

In support thereof, the Debtors assert:

1.  Petition.  On or about June 9, 2017, the Debtors commenced their Chapter 11 case (the "Petition Date"), by filing voluntary petitions for relief under Chapter 11 of Title 11 (the "Bankruptcy Code").

2.  Jurisdiction and Venue.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.  Notice.  Notice shall be given by the Debtors of this Motion for relief under Bankruptcy Rule 4001(c).

4.  Cash Collateral.  All of the cash of the Debtors in existence on the Petition Date and all cash that is acquired by the Debtors after the Petition Date as proceeds of Pre-Petition Collateral constitutes cash collateral (the "**Cash Collateral**") within the meaning of Section 363(a) of the Bankruptcy Code for the benefit of Simmons Bank.

5.  Loan Agreement. Pursuant to the terms of a certain note dated July 31, 2013, in the original principal amount of $5,000,000 (the "Loan") and subject to the terms and conditions of a certain Amended and Restated Commercial Loan Agreement entered into as of March 31, 2015, as amended (the "Loan Agreement"), by and between Simmons Bank and the Debtors, together with non-debtors, Hevin, LLC ("Hevin") and Bruce Harris ("Harris"), an

In the United States Bankruptcy Court for the District of Kansas
IN RE: A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
Bankruptcy Case No.
Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
Bank, Successor by Conversion to Simmons First National Bank
Page 3

individual, collectively referred to as "Borrowers" and/or "Guarantors"). A true and correct copy of the Loan Agreement, together with all subsequent amendments, are attached hereto as **Exhibit A** and incorporated by reference herein.

6. <u>Note</u>. The Loan is evidenced by that certain Amended and Restated Revolving Credit Note dated March 31, 2015, in the principal amount of $4,000,000 ("Note"), signed by Borrowers payable to the Order of Simmons Bank. A true and correct copy of the Note, together with all subsequent modifications and extensions thereof, are attached hereto as **Exhibit B** and incorporated herein by reference. The Loan Agreement and Note are hereinafter collectively referred to as the "Pre-Petition Obligations."

7. <u>Security Agreement</u>. The Note is secured by that certain Commercial Security Agreement dated as of July 31, 2013 (the "Security Agreement"), a copy of which is attached hereto as **Exhibit C**, whereby Borrowers granted to Simmons Bank a security interest in the following personal property (collectively, the "Assets"):

    a. All accounts receivable (consisting of all accounts; general intangibles; chattel paper (including without limit electronic chattel paper and tangible chattel paper); contract rights; deposit accounts; documents; instruments; rights to payment evidenced by chattel paper, documents or instruments; health care insurance receivables; commercial tort claims; letters of credit; letter of credit rights; supporting obligations; and rights to payment for money or funds advanced or sold);

    b. All inventory in all of its forms, wherever located, and raw materials and

In the United States Bankruptcy Court for the District of Kansas
IN RE: A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
       Bankruptcy Case No.
       Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
       Bank, Successor by Conversion to Simmons First National Bank
Page 4

work in process therefor, finished goods thereof, and materials used or consumed in the manufacture or production thereof; goods in which the Borrowers have an interest in mass or joint other interest or right of any kind (including, without limitation, goods in which the Borrowers have an interest or right as co-signee); and goods which are returned to or repossessed by the Borrowers;

c.  All equipment and fixtures, in all its forms, wherever located;

d.  All software (consisting of all (i) computer programs and supporting information provided in connection with a transaction relating to the program, and (ii) computer programs embedded in goods and any supporting information provided in connection with a transaction relating to the program whether or not the program is associated with the goods in such a manner that it customarily is considered part of the goods, and whether or not, by becoming the owner of the goods, and whether or not the program is embedded in goods that consist solely of the medium in which the program is embedded;

e.  All goods, instruments, documents, policies and certificates of insurance, deposits, money, investment property or other property (except real property which is not a fixture) which are now or later in possession or control of Simmons Bank, or as to which Simmons Bank now or later controls possession by documents or otherwise; and

In the United States Bankruptcy Court for the District of Kansas
IN RE:    A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
          Bankruptcy Case No.
          Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
          Bank, Successor by Conversion to Simmons First National Bank
Page 5

      f.      All additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind (including but not limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Borrowers.

8.     Financing Statement.  The security interest granted in the Security Agreement was properly perfected by the filing UCC-1 Financing Statement #7017312 (the "Financing Statement") with the Kansas Secretary of State on August 5, 2013. A true and correct copy of the Security Agreement and Financing Statement are attached hereto as **Exhibit D** and incorporated herein by this reference. The Security Agreement and Financing Statement are hereinafter collectively referred to as the "Pre-Petition Collateral."

9.     Guaranty.  Harris executed and delivered to Simmons Bank a Guaranty effective as of July 13, 2013 (the "Guaranty") unconditionally guaranteeing the payment and performance of the Note. A true and correct copy of the Guaranty is attached hereto as **Exhibit E** and incorporated herein by this reference.

10.    Loan Documents.  The Loan Agreement, Note, Security Agreement, Guaranty and all other loan documents delivered to Simmons Bank in connection with the Loan are collectively referenced to as the "Loan Documents."

11.    Post-Petition Use of Cash Collateral.  The Debtors hereby request for the Debtors' use of Cash Collateral and other financial accommodations on the terms and conditions set forth

In the United States Bankruptcy Court for the District of Kansas
IN RE: A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
Bankruptcy Case No.
Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
Bank, Successor by Conversion to Simmons First National Bank
Page 6

in the final order.

12. <u>Extension of Loan Documents and Pre-Petition Obligations</u>. The Debtors request the Court approve any extension of maturity of the Loan Documents required to effectuate the terms of this Motion and the requested Interim Order.

13. <u>Need for Use of Cash Collateral and Related Financial Accommodations</u>. Absent entry of an Order herein, the Debtors do not have sufficient sources of working capital, including cash collateral, to continue the orderly operation of their businesses and administration of their estates. Accordingly, the access of the Debtors to sufficient working capital and liquidity through the Cash Collateral is vital to the operation and maintenance of the Debtors' estate and is necessary to maximize the recovery to which creditors of the Debtors are entitled.

14. <u>Budget & Variance</u>. The Debtors have prepared and delivered a budget (the "**Budget**"), which is annexed hereto as **Exhibit F**. Such Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, the projected disbursements for the periods covered thereby. The Debtors represent in its good faith determination that the Budget is achievable in accordance with the terms herein and will allow the Debtors to operate at all times during these cases without the accrual of unpaid administrative expenses. A monthly variance not to exceed fifteen percent (15%) of the budgeted amounts of total cash disbursements for such month by category and in the aggregate shall be allowed in any line item of the Budget. The Debtor shall submit daily management reports for all:

In the United States Bankruptcy Court for the District of Kansas
IN RE:    A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
          Bankruptcy Case No.
          Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
          Bank, Successor by Conversion to Simmons First National Bank
Page 7

     a.      Check cashing;

     b.      Payday loans;

     c.      Title loans;

     d.      Installment loans;

     e.      Line of credit loans; and

     f.      Pawn service store reports.

Copies of exemplaries are attached hereto as **Exhibit G**.    As adequate protection for any use or diminution in the value of the Simmons Bank's respective interest in the Pre-Petition Collateral (including, without limitation, the Cash Collateral), the Debtors (i) will comply with the Budget and shall not make any disbursements other than those set forth in the Budget, subject to the 15% variance; and (ii) will deliver to Simmons Bank, by the end of the second business day of each week, a weekly variance report setting forth Budget-to-actual comparisons for the immediately prior week. The Budget may be modified with the prior written consent of the Simmons Bank, without further order of the Court, or upon order of the Court as necessary.    Each modified budget shall be filed with the Court.

15.    <u>Consultant- Roger Eastwood.</u>   Concurrently with this Motion the Debtors have requested approval to employ Roger Eastwood to serve as a professional business consultant to the estate.   Mr. Eastwood's primary duties will be as a consultant performing independent review, investigatory and oversight services of the Debtors for the benefit of counsel, the secured creditor and the estates.   The duties will be as determined and shall subsequently

In the United States Bankruptcy Court for the District of Kansas
IN RE:    A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
          Bankruptcy Case No.
          Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
          Bank, Successor by Conversion to Simmons First National Bank
Page 8

16.   <u>Business Judgment and Good Faith</u>.   The Debtors submit that the use of Cash Collateral and the grant of adequate protection liens hereunder is fair, just and reasonable under the circumstances and reflects the Debtors' exercise of its prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

17.   <u>Authorization to Use Cash Collateral</u>.   The Debtors shall be authorized to use the Cash Collateral pursuant to the terms and conditions set forth herein during the period commencing on the Petition Date through the date of any hearing on any final order as set forth by the Court (**"Financing Period"**) in such amounts as set forth in the Budget. During the Financing Period, the Debtors' expenditures shall be limited to those expenditures specifically authorized in the Budget.

18.   <u>Adequate Protection Payment</u>.   The Financing Period shall be extended upon entry of a final order for a period of ninety (90) days after entry of the interim order.   As adequate protection of Simmons Bank's interest, a monthly payment representing the non-default rate of monthly interest accruing on Simmons Bank's Pre-Petition Credit Facility and Pre-Petition Obligations as set forth in the Budget shall be paid no later than the tenth (10th) day of each calendar month beginning in July, 2017, during the Financing Period pursuant to the provisions of Section 363 of the Bankruptcy Code.   In addition, the Debtors propose the right to satisfy in full any secured debt due Simmons Bank.

19.   <u>Adequate Protection Lien</u>. Simmons Bank shall have and is hereby granted as adequate protection   for   any   post-petition   diminution   in   value   of   its   Pre-Petition   Collateral

In the United States Bankruptcy Court for the District of Kansas
IN RE:   A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
         Bankruptcy Case No.
         Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
         Bank, Successor by Conversion to Simmons First National Bank
Page 9

(including, without limitation, Cash Collateral), additional and replacement security interests and liens in and upon all of the Pre-Petition Collateral and all of the Debtors' now owned and after acquired assets and rights of any kind or nature and wherever located, including causes of action pursuant to Chapter 5 of the Bankruptcy Code (the "**Adequate Protection Collateral**").  The Adequate Protection Collateral is referred to herein as the "**Collateral.**"  In accordance with Sections 553(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Collateral, in excess of the amount of obligations secured by such Collateral shall constitute adequate protection for the use by the Debtors and the diminution in the value of the Collateral existing on the Petition Date.  The Adequate Protection Liens shall be senior and prior to all other interests or liens whatsoever in or on the Collateral, and shall be subject and junior only to the Carve Out Costs (as defined below) and any duly perfected and unavoidable existing liens that are senior to Simmons Bank's Pre-Petition Liens (the "**Permitted Liens**").

20.   Perfection of Adequate Protection Liens.  The entry of a final order shall be sufficient and conclusive evidence of the priority, perfection and validity of the Adequate Protection Liens, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien (a "**Perfection Act**").  Notwithstanding the foregoing, if Simmons Bank, in its sole discretion, elects for any reason to file, record or otherwise effectuate any Perfection Act, Simmons Bank is authorized to perform such act and the Debtors are authorized and directed to perform such

In the United States Bankruptcy Court for the District of Kansas
IN RE: A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
Bankruptcy Case No.
Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
Bank, Successor by Conversion to Simmons First National Bank
Page 10

act to the extent necessary or required by Simmons Bank, which act or acts shall be deemed to have been accomplished as of the date and time of the entry of any interim or final order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Simmons Bank may choose to file, record or present a certified copy of any interim or final order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of any interim or final order in accordance with applicable law. Should Simmons Bank so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment or perfection of the Adequate Protection Liens granted herein by virtue of the entry of any interim or final order.

21.   No Liens, Additional Adequate Protection. As further adequate protection of the Simmons Bank's interest, the Debtors will not grant any additional liens on any of its assets. Simmons Bank reserves the right to file with the Court a motion to seek additional adequate protection of its interest.

22.   Superpriority Administrative Expense. To the extent of the Debtors' use of Cash Collateral and any other diminution in value, Simmons Bank shall have an allowed superpriority administrative expense claim as provided and to the full extent allowed by Sections 503(a), 507(a) and 507(b) of the Bankruptcy Code and otherwise (the

In the United States Bankruptcy Court for the District of Kansas
IN RE:    A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
          Bankruptcy Case No.
          Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
          Bank, Successor by Conversion to Simmons First National Bank
Page 11

"**Superpriority Claim**"). The Superpriority Claim shall, subject to the Carve Out Costs (as hereinafter defined), be an allowed claim against the Debtors with priority over any and all other administrative expenses and all other claims (with the exception of the Carve Out Costs) against the Debtors, now existing or hereinafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors.

23.    Carve Out Costs.  Upon the termination of any Order hereunder, the liens and security interests of Simmons Bank in the Collateral and the Superpriority Claim shall be subject only to the right of payment of the following expenses (the "**Carve Out Costs**"):

        a.        Fees payable to the Clerk of this Court;

        b.        Subject to the terms and conditions of any interim or final order and further subject to the aggregate amounts set forth in the Budget, the unpaid and outstanding reasonable fees and expenses incurred on or after the Petition Date and approved by a final order of the Court pursuant to Sections 326, 328, 330 or 331 of the Bankruptcy Code (collectively, the "**Allowed Professional Fees**"), by attorneys, accountants and other professionals

In the United States Bankruptcy Court for the District of Kansas
IN RE: A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
Bankruptcy Case No.
Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
Bank, Successor by Conversion to Simmons First National Bank
Page 12

retained by the Debtors and Creditor Committee counsel (collectively, the

**"Debtors' Professionals"**); and

c.      In addition, statutory United States Trustee fees shall be part of the allowed

Carve Out Costs.

24.    <u>Carve Out Costs – Usage</u>.  No portion of the Carve Out Costs and no Pre-Petition

Collateral (or proceeds thereof) may be used to pay any fees or expenses incurred by any

entity, including the Debtors in connection with claims or causes of action adverse to the

Simmons Bank's interest in the Pre-Petition Collateral including (1) preventing, hindering,

or delaying Simmons Bank's enforcement or realization upon any of the Pre-Petition

Collateral once and Event of Default has occurred; (2) using or seeking to use Cash

Collateral or incurring indebtedness in violation of the terms hereof, or selling any

Pre-Petition Collateral without the consent of Simmons Bank; or (3) objecting to or

contesting in any manner, or in raising any defenses to, the validity, extent, amount,

perfection, priority, or enforceability of the Pre-Petition Obligations or any liens or

security interests with respect thereto or any other rights or interest of Simmons Bank, or in

asserting any claims or causes of action, including, without limitation, any actions under

chapter 5 of the Bankruptcy Code, against Simmons Bank.

25.    <u>Events of Default</u>.  The following shall constitute an Event of Default:

a.      Failure to make any required Adequate Protection Payment;

b.      The violation by the Debtors of any terms of the Interim Order;

c.      Debtors failure to satisfy any covenants under the Loan Documents not

In the United States Bankruptcy Court for the District of Kansas
IN RE: A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
Bankruptcy Case No.
Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons Bank, Successor by Conversion to Simmons First National Bank
Page 13

otherwise altered or amended herein;

      d.    A material change in Roger Eastwood's employment in this case;

      e.    A motion for sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code that prohibits a credit bid by Simmons Bank on any of its collateral;

      f.    The entry of an order converting this to a case to Chapter 7 or terminating the authority of the Debtors to operate business; and

      g.    The appointment of a trustee in this case.

26.    General Provisions.

      a.    Simmons Bank will not be deemed to have suspended or waived any of its rights or remedies under the Interim Order, the Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law unless such suspension or waiver is hereafter made in writing, signed by a duly authorized officer or agent of Simmons Bank and directed to Debtors. No failure of the Simmons Bank to require strict performance by Debtors of any provision of Interim Order will waive, affect, or diminish any right of Simmons Bank thereafter to demand strict compliance and performance therewith, and no delay on the part of Simmons Bank in the exercise of any right or remedy under the Interim Order, the Loan Documents, or applicable nonbankruptcy law will preclude the exercise of any right or remedy. Further, the Interim Order does not constitute a waiver by Simmons Bank of any of its respective rights under the Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law, including, without limitation, Simmons Bank's right to later assert that any of its interests in the Pre-Petition Collateral lack adequate

In the United States Bankruptcy Court for the District of Kansas
IN RE:    A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
          Bankruptcy Case No.
          Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
          Bank, Successor by Conversion to Simmons First National Bank
Page 14

protection within the meaning of Bankruptcy Code sections 362(d) or 363(e) or any other provision thereof or a claim under section 507(b) of the Bankruptcy Code. Notwithstanding the foregoing, Simmons Bank agrees to forebear collection against any guarantor during the pendency of this case, provided that the Debtors are not in default of the terms of this Motion and the companion Order.

      b.     To the extent there exists any conflict among this Motion, the Loan Documents, and the terms of the Interim Order, the Interim Order shall govern and control.

      c.     In connection with the sale or other disposition, whether under Bankruptcy Code section 363 or otherwise, of all or any portion of the Pre-Petition Collateral in which the Simmons Bank has an interest, pursuant to section 363(k) of the Bankruptcy Code, the Simmons Bank shall have the right to use the Pre-Petition Obligations or any part thereof to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Pre-Petition Collateral.

      d.     Subject to the entry of a final order, Simmons Bank and the Pre-Petition Collateral will not be subject to the doctrine of marshaling.

27.    <u>Binding Effect.</u>  The provisions of this motion and the Loan Documents, the obligations herein, the Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of Simmons Bank provided or acknowledged herein, and any actions taken pursuant hereto, shall be effective immediately upon entry of any interim or final order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including, without limitation any order which may be entered confirming any Plan of Reorganization, converting these cases to any other chapter under the Bankruptcy Code, or

In the United States Bankruptcy Court for the District of Kansas
IN RE:     A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
           Bankruptcy Case No.
           Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
           Bank, Successor by Conversion to Simmons First National Bank
Page 15

dismissing these cases.

Any order dismissing these cases under Section 1112 or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that:

    a.    The Superpriority Claim and the liens and security interests of Simmons Bank in the Collateral shall continue in full force and effect notwithstanding such dismissal until the Debtors' Pre-Petition Obligations and Adequate Protection Obligations are indefeasibly paid and satisfied in full; and

    b.    This Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and liens in the Collateral.

Any interim or final order shall be binding upon the Debtors, all parties in interest in these cases and their respective successors and assigns, including any trustee of fiduciary appointed in the cases, or any subsequently converted bankruptcy cases of the Debtors. The interim or final order shall also inure to the benefit of the Pre-Petition Lender and the Debtors and their successors and assigns.

WHEREFORE the Debtors and Simmons Bank pray the Court for appropriate orders granting the use of Cash Collateral, granting Adequate Protection as set forth herein and such other and further relief as the Court may deem just and equitable.

In the United States Bankruptcy Court for the District of Kansas
IN RE:  A-OK Enterprises, LLC; A-OK 1, LLC; A-OK 2, LLC; A-OK 3, LLC; A-OK, Inc.
        Bankruptcy Case No.
        Stipulated Motion for Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Simmons
        Bank, Successor by Conversion to Simmons First National Bank
Page 16

RESPECTFULLY SUBMITTED:

HINKLE LAW FIRM LLC


  /s/Edward J. Nazar
Edward J. Nazar, #09845
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206-6639
316.267.2000 / 316.264.1518 fax
enazar@hinklaw.com
        *Attorneys for Debtors*

KENNEDY BERKELY YARNEVICH & WILLIAMSON, CHTD.


  /s/James R. Angell
James R. Angell, #19329
PO Box 2567
Salina, KS   67402-2567
785.825.4674 / 785.825.5936 fax
jangell@kenberk.com
        *Attorney for Simmons Bank*

## AMENDED AND RESTATED COMMERCIAL LOAN AGREEMENT

THIS AMENDED AND RESTATED COMMERCIAL LOAN AGREEMENT ("Loan Agreement") is made and entered into as of March 31, 2015 by and among SIMMONS FIRST NATIONAL BANK, a national banking association ("Bank"), A-OK, INC., a Kansas corporation, A-OK ENTERPRISES, LLC, a Kansas limited liability company, A-OK 1, LLC, a Kansas limited liability, A-OK 2, LLC, a Kansas limited liability company, A-OK 3, LLC, a Kansas limited liability company, HEVIN, LLC, a Kansas limited liability company (collectively, the "Borrower"), and BRUCE R. HARRIS (the "Guarantor").

W-I-T-N-E-S-S-E-T-H

WHEREAS, Borrower Guarantor and Bank entered into that certain Commercial Loan Agreement dated as of July 31, 2013 (the "Original Loan Agreement").

WHEREAS, Borrower, Guarantor and Bank desire to amend and restate the terms of the Original Loan Agreement in their entirety as further set forth herein.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt of which is hereby acknowledged, Bank, Borrower and Guarantor hereby covenant and agree that the terms of the Original Loan Agreement are restated in their entirety as follows:

1.   **Loan**.   In reliance upon the representations, warranties, and covenants of Borrower and subject to the provisions of this Loan Agreement and the Loan Documents, Bank agrees to lend to Borrower and Borrower agrees to borrow from Bank (the "Loan") as follows:

      1.1.   Principal.   The original aggregate principal amount of the Loan shall not exceed Four Million and No/100 Dollars ($4,000,000.00) as such principal amount may be reduced pursuant to subsection (a) of this Section 1.1.

           (a)   Borrowing Base.   Any Advance of the Loan under this Agreement shall not exceed an amount equal to Borrower's Total Borrowing Base.

           (b)   Note.   The Loan shall be evidenced by, and repaid with interest in accordance with, the Promissory Note of the Borrower executed in favor of Bank of even date herewith.

           (c)   Interest.   The Borrower shall pay interest to the Bank on the outstanding and unpaid principal amount of the Loan in accordance with the terms of the Note.

           (d)   Fees and Expenses.   In addition to the principal and interest evidenced by the Note, the Loan shall include, and Borrower shall pay, all Fees and Expenses in accordance with the terms of the Note, including a $1,000.00 origination fee for this transaction.

           (e)   Prepayments.   Borrower may prepay the Loan, in whole or in part, without penalty at any time prior to the maturity of the Note.



EXHIBIT

tabbies

A

2. **Conditions Precedent to Each Advance**. The obligations of Bank pursuant to this Loan Agreement and the Loan Documents including any obligation to make any Advance to, or on behalf of, Borrower shall be subject to the satisfaction of each of the following conditions as of the date of this Loan Agreement and each Advance, in addition to any conditions precedent set forth elsewhere in this Loan Agreement and the Loan Documents:

2.1. Loan Documents. Borrower shall have executed and delivered all of the Loan Documents to Bank.

2.2. Perfection. The Financing Statements and related Loan Documents shall have been filed or recorded with the appropriate Governmental Authorities and any other actions necessary or desirable to perfect the Liens in the Collateral shall have been taken.

2.3. Fees and Expenses. Bank shall have received an amount equal to the Fees and Expenses incurred prior to or at the closing of this Loan Agreement.

2.4. Compliance. All of the representations and warranties of Borrower shall be accurate and complete as of the date of this Loan Agreement. Borrower shall be in compliance with all provisions of this Loan Agreement and the Loan Documents, and no Event of Default shall have occurred and be continuing prior to the date of this Loan Agreement.

3. **Collateral**. As security for the prompt and complete payment of the Obligations as well as any future Advances, Borrower and Guarantor agree as follows:

3.1. Security Agreement. The terms and provisions set forth in the Security Agreement are unmodified and shall remain in full force and effect and the Borrower hereby ratifies and confirms such terms and conditions and hereby affirms the granting of all security interests granted therein. Borrower hereby expressly represents and warrants that Bank has a first priority, continuing Lien in and to the Collateral and all proceeds from the sale, assignment, rental, lease, exchange, transfer, or other disposition of any of the Collateral. Upon request by Bank, Borrower shall deliver a sufficient quantity of Financing Statements in order to perfect the Liens of Bank in the Security. Bank may record the Financing Statements in any jurisdiction as determined by Bank in its sole and absolute discretion.

3.2. Additional Security. The Collateral shall remain as security for the payment of the Obligations, whether now existing or hereafter incurred by future advances or otherwise, and whether known or unknown as of the date of this Loan Agreement.

3.3. Guaranty. Guarantor hereby acknowledges that the obligations set for in the Guaranty dated July 31, 2013 in favor of Bank, remain in full force and effect and the Guaranty is hereby ratified and confirmed in accordance with its terms.

4.      **Representations and Warranties.** Borrower represents and warrants to Bank, as of the date of this Loan Agreement, as of the date of each Advance of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Obligations exist:

    4.1.      <u>Name</u>. The following are the legal names and principal place of business for each Borrower:

        (a)      A-OK, Inc., 1123 North Rock Road, Bldg. G., Suite 300, Wichita, Kansas 67206.

        (b)      A-OK Enterprises, LLC, 1123 North Rock Road, Bldg. G., Suite 300, Wichita, Kansas 67206.

        (c)      A-OK 1, LLC, 1123 North Rock Road, Bldg. G., Suite 300, Wichita, Kansas 67206.

        (d)      A-OK 2, LLC, 1123 North Rock Road, Bldg. G., Suite 300, Wichita, Kansas 67206.

        (e)      A-OK 3, LLC, 1123 North Rock Road, Bldg. G., Suite 300, Wichita, Kansas 67206.

        (f)      Hevin, LLC, 1123 North Rock Road, Bldg. G., Suite 300, Wichita, Kansas 67206.

        (g)      Borrower does not have any assumed names and does not conduct its business under any trade-names or fictitious names.

    4.2.      <u>Organization; Powers</u>. Borrower is organized, validly existing, and in good standing under the laws of the State of Kansas. Borrower has all requisite power to own the assets and properties of Borrower and the operation of the business of Borrower as now conducted and proposed to be conducted, to enter into this Loan Agreement and the Loan Documents, and to perform all of the representations, warranties, and covenants of Borrower in this Loan Agreement and the Loan Documents. Borrower is qualified and in good standing in the State of Kansas and each other jurisdiction wherever necessary or desirable for the ownership of the assets and properties of Borrower and the operation of the business of Borrower except in jurisdictions where the failure to be qualified and in good standing has not and shall not cause a Material Adverse Change. Borrower has no subsidiaries other than as disclosed to Bank.

    4.3.      <u>Binding Obligation</u>. The execution, delivery, and performance of this Loan Agreement and the Loan Documents have been authorized by Borrower. All required action has been taken by Borrower to authorize the execution and delivery of this Loan Agreement and the Loan Documents and to authorize the performance of the representations, warranties, and covenants of Borrower in this Loan Agreement and the Loan Documents.

Case 17-11096    Doc# 19    Filed 06/09/17    Page 19 of 87

4.4. No Conflict. The execution, delivery, and performance of this Loan Agreement and the Loan Documents do not, and shall not violate: (a) any Applicable Law; (b) any order, writ, judgment, injunction, decree, determination, or award of any Governmental Authority; (c) the governing documents of Borrower; or (d) any contract of Borrower with any Person.

4.5. Consent; Licenses. The execution, delivery, and performance of this Loan Agreement and the Loan Documents do not require the prior or subsequent consent of any Governmental Authority or other Person other than the officer of Borrower. All Governmental Authorizations have been issued that may be necessary or desirable for the current operations of Borrower, and all Governmental Authorizations are in good standing and have never been suspended, revoked or terminated for any reason.

4.6. Material Contracts. Each contract material to conducting the business of Borrower is in writing and is in full force and effect and enforceable in accordance with its provisions.

4.7. Title to Collateral. Except for Liens granted to Bank, Borrower has good and marketable title to the Collateral free and clear of any Lien. Borrower is the sole owner of the Collateral, and there are no outstanding options or other rights to purchase all or any part of the Collateral in favor of any Person.

4.8. Priority. Unless otherwise previously disclosed to Bank in writing, Borrower has not entered into or granted any Security Instruments or permitted the filing or attachment of any Liens on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and the Note, that would be prior or that may in any way be superior to Bank's Liens and rights in and to such Collateral.

4.9. Environmental Condition. The Collateral is not, and as of the date of this Loan Agreement shall not be, in violation of any Environmental Law. No Hazardous Materials are currently being stored, made, or used in connection with the Collateral, except in strict compliance with Environmental Law.

4.10. Financial Reports. The Financial Reports delivered to Bank prior to the date of this Loan Agreement fairly and completely present in all material respects the financial condition of Borrower in accordance with consistently applied accounting principles.

4.11. Liabilities. Borrower has no fixed or contingent liabilities, except for liabilities shown on the Financial Reports, liabilities arising in the ordinary course of business consistent with past practice, and liabilities to Bank.

4.12. Solvency. Borrower is now solvent and has never in the past been the subject of any bankruptcy, insolvency, reorganization, liquidation proceeding or any other similar proceeding.

Case 17-11096    Doc# 19    Filed 06/09/17    Page 20 of 87

4.13. <u>Tax Returns and Reports</u>. All federal, state, and local tax returns and reports required to be filed by Borrower have been filed or shall be filed when due with the appropriate Governmental Authorities. All such returns and reports are accurate and complete. All federal, state, and local income, franchise, sales, use, occupation, property, excise, payroll, employment, and other taxes and assessments payable by Borrower has been paid when due. No issues are pending with any Governmental Authority in connection with any of the returns and reports which might cause a Material Adverse Change to Borrower. To the extent required by Applicable Law, all taxes and assessments have been withheld or collected by Borrower. To the knowledge of Borrower, there is no deficiency claimed or proposed to be claimed against Borrower or the Collateral by any Governmental Authority which has not been paid, settled, or adequately reserved for by Borrower.

4.14. <u>Credit Information</u>. Any and all credit or other information provided, or to be provided, to Bank by, or on behalf of, Borrower in connection with this Loan Agreement or the Loan Documents is accurate and complete in all material respects.

4.15. <u>Material Adverse Changes</u>. Borrower has not suffered any one or more changes which, alone or in the aggregate, has had or is reasonably likely to result in a Material Adverse Change.

4.16. <u>Compliance with Laws</u>. Borrower is, and shall remain, in all material respects in compliance with Applicable Law.

4.17. <u>Litigation</u>. There is no, pending or to Borrower's knowledge threatened, Litigation involving the Collateral or Borrower. Borrower is not subject to any order, judgment, or decree, or any other legal restriction, that materially and adversely affects Borrower.

4.18. <u>Disclosure</u>. No statement made or document delivered by Borrower in connection with this Loan Agreement and the Loan Documents contains any known inaccurate or incomplete statement of a known material fact or omits a known material fact necessary to make the statements in this Loan Agreement and the Loan Documents, not misleading in light of the circumstances in which the statement was made or the document delivered. There is no fact known to Borrower which has not been disclosed to Bank in writing and which, so far as Borrower can now foresee, is reasonably likely to cause a Material Adverse Change.

5. **Affirmative Covenants**. In addition to the obligations of Borrower stated elsewhere in this Loan Agreement and the Loan Documents, until the Obligations shall be paid in full, Borrower promises, covenants, and agrees as follows:

5.1. <u>Change of Name</u>. Any Borrower shall send written notice to Bank at least thirty (30) days prior to the effective date of any change in the name of Borrower

Case 17-11096    Doc# 19    Filed 06/09/17    Page 21 of 87

or the adoption of any trade-name, fictitious name, or assumed name. Borrower shall pay all Fees and Expenses incurred or paid by Bank in connection with the continued perfection and priority of the Liens of Bank in the Collateral as a result of any change in the name of Borrower or the adoption of any trade-name, fictitious name, or assumed name.

5.2.    Location of Business.  Any Borrower shall send written notice to Bank at least thirty (30) days prior to any change of its principal place of business. Borrower shall pay all Fees and Expenses incurred or paid by Bank in connection with the continued perfection and priority of the Liens of Bank in the Collateral as a result of any change in any principal place of business.

5.3.    State of Organization.  Any Borrower shall send written notice to Bank at least thirty (30) days prior to any change in the jurisdiction of the organization of Borrower. Borrower shall pay all Fees and Expenses incurred or paid by Bank in connection with the continued perfection and priority of the Liens of Bank in the Collateral as a result of any change in the jurisdiction of its organization.

5.4.    Financial Reports.  Until the Obligations shall be paid in full, Borrower shall submit to Bank the following:  (a) on a monthly basis, company prepared balance sheet and income statement to be submitted to Bank within thirty (30) days after the end of each month; (b) annual balance sheet and income statement audited by a certified public accountant satisfactory to Bank and submitted to Bank within one hundred and twenty (120) days of the fiscal year end; (c) prepared annual tax returns with all supporting schedules within one hundred and twenty (120) days of the end of each fiscal year.

5.5.    Borrowing Base.  Borrower covenants and agrees with Bank that, so long as this Loan Agreement remains in effect and Borrower is utilizing the Loan, Borrower will deliver to Bank within thirty (30) days following the end of each month, a borrowing base certificate signed by an authorized financial officer of Borrower, in a form substantially similar to that attached hereto as Exhibit A, with accounts receivables, notes payable and inventory setting forth (i) the information and computations (in sufficient detail) to establish that Borrower is in compliance with the borrowing base at the end of the period covered, and (ii) whether there existed as of the date of such borrower base, any Event of Default under this Loan Agreement, and if any such default exists, specifying the nature thereof and the action Borrower is taking and proposes to take with respect thereto.    The calculation of Total Borrowing Base and the respective advance rates are defined in the Officer Certificate and Borrowing Base attached hereto as Exhibit A.

5.6.    Compliance Certificate.  Upon request by Bank, an appropriate officer of Borrower shall execute and deliver a compliance certificate to certify to Bank that: (a) the Financial Reports are materially accurate, complete and fairly represent Borrower's financial condition; (b) Borrower shall be in compliance with this Loan Agreement; (c) whether Borrower has reason to believe that any of its representations, warranties, and covenants in this Loan Agreement and the

Case 17-11096    Doc# 19    Filed 06/09/17    Page 22 of 87

Loan Documents have been breached by Borrower; (d) no Event of Default has occurred; and (e) all such other matters as reasonably requested by Bank.

5.7.     Operating Accounts.  Borrower shall maintain all of its operating accounts with Bank and all payments on the Loan shall automatically be debited from Borrower's operating accounts.

5.8.     Minimum Net Worth.  Effective as of July 31, 2015, Borrower must maintain at all times a minimum net worth of Three Million and No/100 Dollars ($3,000,000.00) on a global basis.

5.9.     Payment of Taxes.  Borrower shall file all federal, state, and local tax returns and reports required by Applicable Law.  All federal, state, and local income, franchise, sales, use, occupation, property, excise, payroll, employment taxes and assessments shall be paid when due; provided however, as long as no Lien shall be imposed on the Collateral, Borrower may not pay any tax or assessment if Borrower contests, in good faith, the validity or amount thereof, and has set aside adequate reserves with respect thereto.

5.10.   Existence.  Borrower shall take all actions necessary or desirable to preserve, renew, and maintain in full force and effect the existence, rights, contracts, Governmental Authorizations of Borrower to the extent necessary or desirable for the lawful proper operation of the business of Borrower.  Borrower shall notify Bank of any change in the ownership or key management of Borrower.

5.11.   Maintenance of Properties; Assets.  Borrower shall preserve and maintain its properties and assets used or useful in the operation of the businesses of Borrower in good working order and condition and shall make all repairs, replacements, and improvements thereto as necessary or desirable for the proper operation of the business of Borrower.

5.12.   Licenses.  Borrower shall take all necessary or desirable actions to maintain in good standing all Governmental Authorizations that may be necessary or desirable for the proper operation of the business of Borrower.

5.13.   Insurance.  Borrower shall procure and maintain fire and other risk insurance, public liability insurance, and such other insurance as Bank may require with respect to Borrower's properties and operations, in form and coverage amounts acceptable to Bank.   All insurance policies shall have such deductibles and cover such risks of loss as customarily maintained by Persons engaged in similar businesses.  All insurance policies shall provide that coverage shall not lapse for any reason whatsoever without the insurer providing prior written notice of not less than fifteen (15) days to Bank.  All insurance policies shall name Borrower as named insured and Bank as an additional insured.  Borrower shall deliver to Bank a copy of each insurance policy and each renewal thereof.  Borrower shall deliver to Bank such certificates of insurance as may be

Case 17-11096   Doc# 19   Filed 06/09/17   Page 23 of 87

necessary to show the compliance of Borrower with the insurance requirements of this Loan Agreement and the Loan Documents. Promptly after receipt of any payment of proceeds of any insurance required to be maintained pursuant to this Loan Agreement or the Loan Documents, Borrower shall consult Bank as to appropriate course of action which will be: (a) apply an amount equal to such proceeds to the prepayment of the Obligations; or (b) if approved by Bank, apply such amount of the proceeds as necessary to cause the Collateral to be repaired and restored to its condition prior to the loss, damage, or injury and apply any remaining amount of the proceeds to the prepayment of the Obligations. If Borrower shall fail to maintain the insurance required by this Loan Agreement or the Loan Documents, Bank may, but shall not be obligated to, procure such insurance, and Borrower shall pay all Fees and Expenses incurred or paid by Bank in connection with maintaining any such insurance.

5.14.  Compliance With Laws.  Borrower shall comply in all material respects with the requirements of all Applicable Laws. Borrower may contest any such Applicable Law in good faith and by appropriate Litigation as long as Borrower shall have set aside adequate reserves sufficient to pay any liability arising from the failure to comply with such Applicable Law.

5.15.  Litigation.  Borrower shall promptly notify Bank in writing of any Litigation in which Borrower shall be named as a party or in which the Collateral may be involved.

5.16.  Lender Liability.  The provisions of this Loan Agreement and the Loan Documents shall not be deemed to indicate that Bank shall be in control of Borrower or that Bank shall be otherwise closely-connected to Borrower. If Borrower shall develop any perception that Bank shall have taken any action or shall have engaged in any conduct in a wrongful or unlawful manner, Borrower shall notify Bank in writing no later than three (3) days of developing the perception.

5.17.  Indemnification.  Borrower shall indemnify Bank from and against any and all claims, losses, and liabilities, including but not limited to, reasonable attorneys' fees, arising from any Event of Default, breach, or failure to comply with any provision of this Loan Agreement or the Loan Documents (without regard to fault or intent of Borrower) or otherwise arising from the Obligations, this Loan Agreement, and the Loan Documents, except claims, losses, or liabilities resulting solely and directly from the gross negligence or willful misconduct of Bank. The indemnification provided for in this Section shall survive the payment in full of the Obligations for the maximum period allowed by Applicable Law.

5.18.  Performance by Bank.  If Borrower shall fail to perform any of its obligations pursuant to this Loan Agreement or the Loan Documents following applicable cure rights, Bank may perform or cause the performance of such obligation, and Borrower shall pay the Fees and Expenses incurred by Bank in

Case 17-11096   Doc# 19   Filed 06/09/17   Page 24 of 87

connection therewith, plus interest at the highest lawful rate of interest. Notwithstanding the foregoing, nothing in this Loan Agreement shall obligate Bank to perform any of the obligations of Debtors pursuant to this Loan Agreement or the Loan Documents.

5.19.  Material Adverse Changes.  Borrower shall notify Bank of any one or more changes which, alone or in the aggregate, has had or is reasonably likely to result in a Material Adverse Change.

5.20.  No Covenant to Renew.  Borrower acknowledges that Bank has made no representation, warranty, or covenant whatsoever to renew, rework, refinance, extend, waive, release or otherwise permit Borrower to pay the Loan past the maturity dates stated in the Note.

5.21.  Affiliate Contracts.  Any contracts, agreements, or understandings entered into between Borrower and any Affiliates of Borrower, or with any Affiliates of any ultimate individual owner of any members of Borrower, may upon the occurrence of an Event of Default that has not been cured pursuant to applicable cure rights, be terminated by Lender, in Lender's sole discretion, immediately upon written notice. Notwithstanding any terms or conditions above, any and all contracts, agreements or understanding, entered into between Borrower and any other party shall be on fair, reasonable and arms length terms and conditions.

6.  **Negative Covenants**.  In addition to the obligations of Borrower stated elsewhere in this Loan Agreement and the Loan Documents, until the Obligations shall be paid in full, Borrower promises, covenants, and agrees as follows:

6.1.  Other Secured Debts.  Without the prior written consent of Bank, in its sole and absolute discretion, neither Borrower nor Guarantor shall not incur any direct or contingent liabilities or lease obligations (other than those to Bank).

6.2.  Non-Affiliated Debts.  All non-Affiliated debts of Borrower shall be unsecured and subordinated to the Obligations of Borrower to Bank. Upon the occurrence of an Event of Default, Borrower shall not make any payment or distribution, of any nature or character whatsoever, to any Person pursuant to any non-Affiliated debt, obligation or other related indebtedness.

6.3.  Dividends; Distributions.  Upon the occurrence of an Event of Default, Borrower shall neither directly nor indirectly: (a) declare any dividend or make any distributions of consideration, of any nature or character whatsoever, to the members, employees and/or service providers of Borrower, except to the extent necessary to pay taxes resulting from the income of Borrower; (b) make any payment on debts of Borrower to the members, employees and/or service providers of Borrower; or (c) make any loans to the members, employees and/or service providers of Borrower.

6.4.  Liens.  Without the prior written consent of Bank in its sole and absolute discretion, Borrower shall not grant, suffer, or permit any Lien on any of the

Collateral, whether voluntarily or involuntarily, by operation of law or otherwise. Borrower shall have the right to contest, in good faith, any Lien which shall arise against the Collateral, provided Bank may require, in Bank's sole discretion, Borrower to provide adequate security or "bond around" such Lien. In no event shall any Lien which Borrower contests be permitted to be foreclosed.

6.5. <u>Disposition of Collateral</u>. Without the prior written consent of Bank, in its sole and absolute discretion, Borrower shall not sell, assign, lease, exchange, or transfer any of its rights in the Collateral, whether voluntarily or involuntarily, by operation of law or otherwise.

6.6. <u>Negative Pledge</u>. Borrower shall not pledge or encumber the Collateral or any of its other assets, if any, without the prior written consent of Bank in its sole and absolute discretion.

6.7. <u>Offset</u>. If Borrower shall have any claim whatsoever against Bank, Borrower shall not offset the claim against any payment on the Obligations or any other amount owed to Bank by Borrower.

6.8. <u>Fundamental Changes</u>. Without the prior written consent of Bank in its sole and absolute discretion Borrower shall not: (a) become a party to any merger, amalgamation, consolidation, dissolution, or liquidation; (b) sell, lease, or otherwise dispose of all or substantially all of the assets of Borrower; (c) sell, lease, or otherwise dispose of any material asset; (d) cause, suffer, or permit all or any of its membership interests to be sold or transferred except to an existing owner of Borrower; (e) acquire all or substantially all of the assets of any other Person; (f) acquire all or substantially all of the securities of any other Person; or (g) establish a subsidiary.

7. **Default Provisions**.

7.1. <u>Events.</u> The occurrence of any of the following events shall constitute an "Event of Default" pursuant to this Loan Agreement and the Loan Documents:

(a) <u>Non-Payment</u>. Borrower shall fail to make any payment of the Obligations when due and payable.

(b) <u>Breach</u>. Borrower shall fail to comply with any provision of this Loan Agreement or the Loan Documents.

(c) <u>Judgments and Attachments</u>. Any judgment or attachment shall be rendered against the Collateral or Borrower in excess of Twenty-Five Thousand Dollars ($25,000.00), and shall not be stayed, appealed, or satisfied within thirty (30) days after being rendered.

(d) <u>Non-Payment of Tax or Liability</u>. Borrower shall fail to pay any tax, assessment, or other liability in excess of Five Thousand Dollars ($5,000.00) when due, except when such tax, assessment, or

other liability shall be contested in good faith as set forth in this Loan Agreement.

(e)    <u>Transfer</u>.  All or any part of the Collateral shall be directly or indirectly, voluntarily or involuntarily, assigned or transferred, except in the ordinary course of business, consistent with past practices.

(f)    <u>Material Contract</u>.  Borrower shall be in breach, default, or violation of any contract material to the businesses of Borrower, subject to applicable cure rights or grace periods set forth in such contracts.

(g)    <u>Insurance</u>.  Borrower shall fail to maintain any insurance required by this Loan Agreement and the Loan Documents.

(h)    <u>License</u>.  Any Governmental Authorization required by this Loan Agreement shall be suspended, revoked, or terminated for any reason.

(i)    <u>Appointment of Receiver</u>.  A receiver shall be appointed for the Collateral or Borrower.

(j)    <u>Assignment for Benefit</u>.  Borrower shall make any assignment for the benefit of creditors.

(k)    <u>Dissolution</u>.  Dissolution, termination of existence, merger, or consolidation of Borrower.

(l)    <u>Death</u>.  The death of Guarantor.

(m)    <u>Bankruptcy</u>.  Borrower and/or Guarantor shall file a voluntary petition of bankruptcy or an involuntary petition shall be filed against Borrower and/or Guarantor.

(n)    <u>Insolvency</u>.  Borrower and/or Guarantor shall be insolvent.

(o)    <u>Failure of Security</u>.  Bank shall fail or cease to have a continuing, first priority, perfected Lien on any of the Collateral.

(p)    <u>Default under other Agreements</u>.  Any event that results in a default and/or in the acceleration of the maturity of any present or future indebtedness of Borrower to any creditor (including Bank) under any contract, promissory note, mortgage, deed of trust, security agreement, indenture, or other agreement.

(q)    <u>Change of Control</u>.  Any change in ownership of twenty-five (25%) or more of the membership interest of Borrower.

7.2.   Cure.  Borrower shall have ten (10) days after the occurrence of an Event of Default under Section 7.1(a) to cure such Event of Default and shall have thirty (30) days to cure any other Event of Default, provided Borrower shall have no cure right upon an Event of Default under Sections 7.1 (e), (i), (j), (k), (l) or (m).

8.   Remedies.  Upon an Event of Default and the expiration of any time afforded to cure the Event of Default, Bank may in its sole and absolute discretion exercise any one or more of the following remedies, without further notice to or consent from Borrower:

8.1.   Termination; Acceleration.  Bank may immediately terminate this Loan Agreement and the Loan Documents by notice to Borrower and declare the unpaid balance of the Obligations to be immediately due and payable.

8.2.   Foreclosure.  Bank may foreclose any Security Instruments granting Liens in the Collateral in the manner permitted by Applicable Law.

8.3.   Termination of Agreements.  Bank may terminate any obligation or commitment for granting further credit to Borrower.

8.4.   Right of Offset.  Bank may offset and apply any and all of the deposits of Borrower with Bank to the payment of the Obligations.

8.5.   Legal Action.  Bank may commence Litigation against Borrower to recover the unpaid balance of the amount due pursuant to this Loan Agreement and the Loan Documents.

8.6.   Loan Documents.  Bank may exercise any one or more remedies permitted pursuant to the Loan Documents to which Borrower and such other Persons are parties.

8.7.   Possession Control.  Bank may take immediate possession or control of any or all of the Collateral wherever the Collateral may be found, and in that regard, Bank may enter upon Borrower's real property without process of law and search and remove all or any part of the Collateral.

8.8.   Sale.  Bank may sell all or any of the Security at private or public sale in such manner and under such circumstances as Bank may determine in its sole and absolute discretion.  All demands of performance, advertisements, notices of sale or retention, manner of sale, as well as the presence of the Security at any sale, and the constructive possession of the Security by the Person conducting any sale are hereby waived by Borrower.  In the event any of the Security shall be sold at private sale, any price which Bank in good faith believes to be reasonable under the circumstances, shall be acceptable, and the sale shall be deemed to be commercially reasonable in all respects, notwithstanding the possibility that a substantially higher price for the Security might have been realized at a public sale.  Borrower acknowledges that a ready market may not exist for the Security and that any sale of the Security for a price substantially less than its fair market

Case 17-11096   Doc# 19   Filed 06/09/17   Page 28 of 87

value minus liabilities may be commercially reasonable in view of the difficulties that may be encountered in attempting to sell the Security.

8.9.     Other Remedies.  Bank may exercise any one or more remedies available under the Kansas Uniform Commercial Code or Applicable Law.

9.     **Definitions**.  The following terms shall have the following definitions for purposes of this Loan Agreement and the Loan Documents:

9.1.     Accounts.  "Accounts" shall have such meaning as provided in the Kansas Uniform Commercial Code.

9.2.     Advance.  "Advance" shall mean a disbursements of Loan funds made, or to be made, or payment of Fees and Expenses by Bank to, or on behalf of, Borrower under the terms and conditions of this Loan Agreement.

9.3.     Affiliate.  "Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a member, director or officer of such Person or of an Affiliate of such Person.

9.4.     Applicable Law.  "Applicable Law" shall mean the constitutions, statutes, codes, ordinances, rules, regulations, orders, decisions, judgments, and decrees of Governmental Authorities of the State of Kansas and other Governmental Authorities having jurisdiction over the Parties or the Collateral.

9.5.     Books and Records.  "Books and Records" shall mean all books, records, files, correspondence, books of account and ledgers, all electronically recorded data, computer programs and records, customer lists, vendor lists, invoices, orders, and other accounting materials, together with the file cabinets or other receptacles and containers for any of the foregoing, that may relate to the Collateral.

9.6.     Collateral.  "Collateral" shall mean the Security and all other security for the Obligations, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise, as well as all additions, accessions, and substitutions thereto or therefor, whether now owned or hereafter acquired, and all proceeds thereof.

9.7.     Environmental Law.  "Environmental Law" shall mean any present and future federal, state, and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, relating to protection of human health or the environment, relating

Loan Agreement
Page 13

to Hazardous Materials that apply to Borrower or the Collateral and relate to Hazardous Materials.

9.8.    Event of Default.  "Event of Default" shall mean those acts, omissions, conditions, occurrences, happenings and events referred to in Section 7 of this Loan Agreement.

9.9.    Fees and Expenses.  "Fees and Expenses" shall mean: (a) all late fees; (b) origination fees; (c) closing fees and expenses; (d) appraisal fees; (e) title and Lien searches; (f) all expenses relating to the perfection of the Liens of Bank in and to the Collateral; (g) all expenses relating to the preservation and protection of the Liens of Bank in and to the Collateral; (h) recording fees; (i) recording taxes; (j) all expenses incurred or paid by Bank while the Collateral shall be in the possession of Bank; (k) all attorneys' fees incurred or paid by Bank during the negotiation, execution, preparation, and closing of this Loan Agreement and the Loan Documents; (l) all attorneys' fees incurred or paid by Bank to enforce or interpret any provision of this Loan Agreement or the Loan Documents; (m) all attorneys' fees incurred or paid by Bank if Bank shall file or commence any Litigation to protect its rights or to enforce any provision of this Loan Agreement or the Loan Documents; (n) accounting fees; (o) travel expenses; (p) all those fees and expenses identified in this Loan Agreement and the Loan Documents; and (q) all expenses incurred or paid by Bank on behalf of Borrower.

9.10.    Financial Reports.  "Financial Reports" shall mean all of the financial statements, balance sheets, income statements, statements of owners' equity, and statements of cash flow and all other documents delivered by, or on behalf of, Borrower or Guarantor to Bank.

9.11.    Financing Statements.  "Financing Statements" shall mean the UCC-1 financing statements to be recorded pursuant to this Loan Agreement to perfect the Liens of Bank in all or part of the Security.

9.12.    General Intangibles.  "General Intangibles" shall have such meaning as provided in the Kansas Uniform Commercial Code.

9.13.    Governmental Authority.  "Governmental Authority" shall mean any executive, legislative, and judicial body, and any agency, department, board, commission, council, court, tribunal, official, or other entity exercising governmental or quasi-governmental powers, of the United States of America, the State of Kansas, and any other nation, state, county, parish, city, community, town, borough, village, district or other jurisdiction having jurisdiction over a Party or the Collateral.

9.14.    Governmental Authorization.  "Governmental Authorization" shall mean any permit, franchise, certificate, registration, or license issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Applicable Law.

Case 17-11096    Doc# 19    Filed 06/09/17    Page 30 of 87

9.15. Guaranty. "Guaranty" shall mean shall mean the guaranty dated July 31, 2013 executed and delivered by Guarantor to Bank.

9.16. Hazardous Materials. "Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that shall be or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on Debtors' real property shall be prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance", "hazardous material", hazardous waste", toxic substance", "toxic pollutant", "contaminant", or "pollutant" within the meaning of any Environmental Law.

9.17. Lien. "Lien" shall mean any: mortgage, deed of trust, pledge, security interest, encumbrance, lease, conditional sale or title retention agreement, hypothecation, right of way, easement, encroachment, servitude, charge, claim, option, right of first option, right of first refusal, equitable interest, community or marital property interest, dower or curtesy, and any other legal or equitable lien or restriction on use of any nature or character whatsoever.

9.18. Litigation. "Litigation" shall mean any pending or threatened lawsuit, action, cause of action, claim for relief, mediation, arbitration, governmental investigation, audit, contest or other legal proceeding of any nature or character whatsoever.

9.19. Loan. "Loan" shall mean any and all loans or financial accommodations from Bank to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule to this Loan Agreement from time to time.

9.20. Loan Agreement. "Loan Agreement" shall mean this document.

9.21. Loan Documents. "Loan Documents" shall mean this Loan Agreement, the Note, Security Agreement, Security Instruments and all other documents that may be made, executed, acknowledged, delivered, filed, or recorded in connection with the Loan, whether now or hereafter existing, together with any and all extensions, modifications, amendments, substitutions, replacements, and renewals thereof.

9.22. Material Adverse Change. "Material Adverse Change" shall mean: (a) a material adverse change in the operation or prospect of the business, properties, assets, revenues, expenses, or financial condition of Borrower; or (b) an

impairment of the ability of Borrower to comply with the provisions of this Loan Agreement or the Loan Documents.

9.23. Obligations. "Obligations" shall mean collectively: (a) the prompt and complete payment of the Loan as and when required pursuant to this Loan Agreement and the Loan Documents and any and all extensions, modifications, amendments, substitutions, replacements, and renewals thereof; (b) the prompt and complete performance of each and every obligation of Borrower and Guarantor pursuant to this Loan Agreement and the Loan Documents; (c) the payment of each indebtedness and the performance of each obligation of Borrower and Guarantor to Bank whether now existing or hereafter arising, voluntarily or involuntarily, by operation of law or otherwise, joint or several, primary or subordinate, absolute or contingent, or liquidated or un-liquidated.

9.24. Party. "Party" shall mean any or all of Bank, Borrower, and Guarantor.

9.25. Person. "Person" shall mean any entity, corporation, company, association, limited liability company, joint venture, joint stock company, partnership, trust, organization, individual (including personal representatives, executors, and heirs of a deceased individual), Governmental Authority, trustee, and receiver, or liquidator.

9.26. Promissory Note. "Promissory Note" or "Note" shall mean the Note executed by Borrower in favor of Bank evidencing the Loan, together with any and all extensions, modifications, amendments, substitutions, replacements, and renewals thereto.

9.27. Security. "Security" shall mean the Accounts, Books and Records, General Intangibles, inventory, chattel paper, equipment and all additions, accessions, substitutions, and replacements thereto, whether now owned or hereafter acquired and all proceeds thereof.

9.28. Security Agreement. "Security Agreement" shall mean the security agreement dated July 31, 2013 executed and delivered by to Borrower to Bank.

9.29. Security Instruments. "Security Instruments" shall mean and include without limitation the Mortgage, Security Agreement and any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract or otherwise, evidencing, governing, representing or creating a Lien.

9.30. Total Borrowing Base. "Total Borrowing Base" shall mean the value of Borrower's accounts receivable and inventory as calculated and as more fully defined in the Officer Certificate and Borrowing Base attached hereto as Exhibit A.

9.31. The above definitions shall apply to all uses of the above terms including the singular, plural, and possessive, and the past, present, and future tense.

Case 17-11096    Doc# 19    Filed 06/09/17    Page 32 of 87

10. **General Provisions.**

10.1. <u>Exhibits.</u> All Exhibits to the Loan Documents as supplemented, modified, or amended from time to time, are hereby incorporated into this Loan Agreement as though they were fully set forth in this Loan Agreement.

10.2. <u>Governing Law.</u> This Loan Agreement and the Loan Documents shall be subject to and governed by the laws of the State of Kansas; provided however, if any part of the Collateral shall be located in any state other than Kansas, the law of the state where the Collateral shall be located shall govern the perfection of Liens of Bank in such Collateral and the law of the State of Kansas shall govern all other aspects of the relationship among the Parties.

10.3. <u>Litigation Forum.</u> The forum for any Litigation shall be in the courts of Sedgwick County, Kansas.

10.4. <u>Rights and Remedies Cumulative.</u> The rights and remedies expressed in this Loan Agreement and the Loan Documents shall be cumulative and not exclusive of any rights and remedies otherwise available to Bank.

10.5. <u>Assignment; Assumption.</u> This Loan Agreement and the Loan Documents shall not be assigned or otherwise transferred by Borrower or assumed by any other Person. Any purported assignment, transfer, or assumption of this Loan Agreement or the Loan Documents shall not release Borrower of any of the obligations of Borrower pursuant to this Loan Agreement or the Loan Documents. Bank may assign, participate, or transfer all or any part of the Loan, this Loan Agreement and the Loan Documents without notice to or the consent from Borrower. In connection with any assignment, participation and transfer by Bank, Borrower hereby consent to the disclosure of information pertaining to the Obligations to prospective assignees, participants, and transferees.

10.6. <u>Further Assurances.</u> Upon request by Bank, Borrower shall execute and deliver such other documents and take such further actions as may be reasonably requested to carry out the provisions of this Loan Agreement and the Loan Documents.

10.7. <u>Modification; Waiver.</u> This Loan Agreement and the Loan Documents may be modified, amended, or waived only by a written agreement signed by the Party to be bound by the modification, amendment, or waiver. The course of dealing among the Parties shall not modify or amend this Loan Agreement or the Loan Documents in any respect. Any delay by Bank in the exercise of any of its rights pursuant to this Loan Agreement or the Loan Documents shall not be construed as a waiver or release of any of the provisions of this Loan Agreement or the Loan Documents. A waiver by Bank of a breach of any provision of this Loan Agreement or the Loan Documents or any waiver by Bank of an Event of Default shall not: (a) operate or be construed as a waiver of any subsequent

breach or Event of Default; (b) limit or restrict any right or remedy otherwise available to Bank; or (c) operate or be construed as a waiver of compliance by Bank as to any other provision of this Loan Agreement or the Loan Documents.

10.8.   Binding Effect and Benefit.   This Loan Agreement and the Loan Documents shall inure to the benefit of and shall be binding upon and enforceable by the heirs, successors, and assigns of the Parties.

10.9.   Notice.   All notices, requests, demands, and other communications permitted or required by this Loan Agreement or the Loan Documents shall be in writing, and (a) delivered in person; (b) sent by express mail or other overnight delivery service providing receipt of delivery; or (c) mailed by certified or registered mail, postage prepaid, return receipt requested, restricted delivery to the relevant party.   All such notices and other communications shall be sent to the following addresses, unless changed by the receiving Party or otherwise known to the sending Party:

> If to Bank:
>
> Simmons First National Bank
> Attn: Commercial Loan Department
> 12121 E. 21st Street North
> Wichita, Kansas 67206
>
> If to Borrower(s):
>
> A-OK, Inc.
> Attn: Bruce R. Harris
> 1123 North Rock Road, Bldg. G., Suite 300,
> Wichita, Kansas 67206.
>
> A-OK Enterprises, LLC
> Attn: Bruce R. Harris
> 1123 North Rock Road, Bldg. G., Suite 300,
> Wichita, Kansas 67206.
>
> A-OK 1, LLC
> Attn: Bruce R. Harris
> 1123 North Rock Road, Bldg. G., Suite 300,
> Wichita, Kansas 67206.
>
> A-OK 2, LLC
> Attn: Bruce R. Harris
> 1123 North Rock Road, Bldg. G., Suite 300,
> Wichita, Kansas 67206.

A-OK 3, LLC
Attn: Bruce R. Harris
1123 North Rock Road, Bldg. G., Suite 300,
Wichita, Kansas 67206.

Hevin, LLC
Attn: Bruce R. Harris
1123 North Rock Road, Bldg. G., Suite 300,
Wichita, Kansas 67206.

If to Guarantor:

Bruce R. Harris
1123 North Rock Road, Bldg. G., Suite 300,
Wichita, Kansas 67206.

10.10. Business Day. If any provision of this Loan Agreement or the Loan Documents requires the performance of an obligation on a date that shall be not a business day of the Bank, Bank may postpone the performance by a Party until the next business day.

10.11. Time for Performance. Time shall be of the essence.

10.12. Third Party Beneficiaries. Except as provided in this Loan Agreement or the Loan Documents, the Parties do not intend to create any rights for the benefit of any third party.

10.13. Counterparts. This Loan Agreement and the Loan Documents may be executed in one or more counterparts. Each counterpart of this Loan Agreement shall be deemed a duplicate original of this Loan Agreement, and all counterparts, when collected together, shall constitute the original of this Loan Agreement. A counterpart may be a full copy of this Loan Agreement or a signature page from a full copy of this Loan Agreement.

10.14. Conflict in Documents. To the extent there may be a conflict between the provisions of this Loan Agreement and any of the Loan Documents, the provisions of this Loan Agreement shall prevail.

10.15. Survival of Representations and Warranties. All representations and warranties made by Borrower in this Loan Agreement and the Loan Documents shall survive the making of the Loan, and shall continue in full force and effect until the Maturity Date or until the Obligations shall be paid in full.

10.16. Severability. Each provision of this Loan Agreement shall be severable from all other provisions of this Loan Agreement and the Loan Documents. Each provision of the Loan Documents shall be severable from all other provisions of this Loan Agreement and the other Loan Documents. If any Governmental

Case 17-11096   Doc# 19   Filed 06/09/17   Page 35 of 87

Authority shall determine, during or at the conclusion of any Litigation, that any provision of this Loan Agreement or the Loan Documents shall be invalid or unenforceable, the provision shall be deemed modified only to the extent necessary to render it valid and enforceable, and all remaining provisions of this Loan Agreement and the Loan Documents shall remain in full force and effect.

10.17. <u>Interpretation.</u> This Loan Agreement and the Loan Documents shall be interpreted as though the Parties participated equally in their preparation and negotiation. The Parties assume joint responsibility for the form and composition of each provision of this Loan Agreement and the Loan Documents. Unless the context would result in a conflict in the provisions of this Loan Agreement: (a) the gender or lack of gender of all words used in this Loan Agreement and the Loan Documents shall include the masculine, feminine, and neuter; (b) the singular shall include the plural; (c) the words "include" or "including" mean, in addition to any regularly accepted meaning, "without limitation" and "including but not limited to"; (d) references to Sections refer to Sections of this Loan Agreement; (e) references to Exhibits are to the Exhibits attached to or delivered with this Loan Agreement; (f) subject headings and captions are included for convenience only and shall not affect the interpretation of this Loan Agreement; and (g) the definitions used herein apply to all capitalized terms.

10.18. <u>Joint and Several.</u> The obligations of Borrower and any other Person obligated for all or any part of the provisions of this Loan Agreement and the Loan Documents shall be joint and several, provided the obligations of Guarantors shall be controlled by their Guaranty.

10.19. <u>Waiver of Jury Trial.</u> THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LITIGATION AMONG THE PARTIES ARISING IN CONNECTION WITH, OUT OF, OR OTHERWISE RELATING TO THIS LOAN AGREEMENT OR THE LOAN DOCUMENTS.

10.20. <u>Statutory Notice.</u> ALL OF THE LOAN DOCUMENTS, INCLUDING THIS LOAN AGREEMENT, TOGETHER WITH ALL OF THE INSTRUMENTS AND WRITINGS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL EXPRESSION OF THE LOAN TRANSACTION BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR OR CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER GUARANTOR AND BANK. BORROWER AND GUARANTOR CONFIRM THAT NO UNWRITTEN ORAL AGREEMENTS EXIST BETWEEN BORROWER AND LENDER.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have caused this Loan Agreement to by executed by their respective officers thereunto duly authorized, as of the date first above written.

BANK:

SIMMONS FIRST NATIONAL BANK

By: _____

Andrea Scarpelli, Regional Senior Credit Officer

Loan Agreement
Page 21

BORROWER:

A-OK, Inc., a Kansas corporation

By: _____
Bruce R. Harris, President & Secretary

A-OK Enterprises, LLC, a Kansas limited liability
company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 1, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 2, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 3, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Manager

HEVIN, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

"GUARANTOR"

_____
Bruce R. Harris, individually

Exhibit A: Officer Certificate and Borrowing Base

Loan Agreement
Page 22

## Exhibit "A"

Officer Certificate and Borrowing Base

# FIRST AMENDMENT TO THE AMENDED AND RESTATED COMMERCIAL LOAN AGREEMENT

THIS FIRST AMENDMENT TO THE AMENDED AND RESTATED COMMERCIAL LOAN AGREEMENT ("Amendment") is made and entered into as of May 30, 2016 by and among SIMMONS BANK, an Arkansas state bank, successor by conversion to Simmons First National Bank ("Bank"), A-OK, INC., a Kansas corporation, A-OK ENTERPRISES, LLC, a Kansas limited liability company, A-OK 1, LLC, a Kansas limited liability, A-OK 2, LLC, a Kansas limited liability company, A-OK 3, LLC, a Kansas limited liability company, HEVIN, LLC, a Kansas limited liability company (collectively, the "Borrower"), and BRUCE R. HARRIS (the "Guarantor").

## W-I-T-N-E-S-S-E-T-H

WHEREAS, Borrower Guarantor and Bank entered into that certain Amended and Restated Commercial Loan Agreement dated as of April 1, 2015 (the "Loan Agreement").

WHEREAS, Borrower, Guarantor and Bank desire to amend the Loan Agreement as further set forth herein.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt of which is hereby acknowledged, Bank, Borrower and Guarantor hereby covenant and agree that the terms of the Loan Agreement are amended as follows:

1. **Amendment to Section 5.4.** Section 5.4 is hereby replaced in its entirety as follows:

> 5.4. <u>Financial Reports</u>. Until the Obligations shall be paid in full, Borrower shall submit to Bank the following: (a) on a monthly basis, company prepared balance sheet and income statement to be submitted to Bank within thirty (30) days after the end of each month; (b) annual balance sheet and income statement reviewed by a certified public accountant satisfactory to Bank and submitted to Bank within one hundred and twenty (120) days of the fiscal year end;

> **No Impairment.** Except as expressly set forth herein, the terms and provisions set forth in the Loan Agreement, all of which are incorporated herein, are unmodified and shall remain in full force and effect and Borrower and Guarantor hereby ratify and confirm such terms and provisions. Unless expressly set forth herein, nothing in this Amendment shall be deemed to or shall in any manner prejudice or impair, or act as a release or relinquishment of, any of the Loan Documents or any rights of Bank under the Loan Documents, or any lien, security interest or assignment granted to and/or held by Bank in connection with the Loan. The execution of this Amendment by Bank does not constitute a waiver, limitation, or modification of any of Bank's rights or remedies under the Loan Documents or applicable law, all of which Bank hereby expressly reserves, nor shall the same constitute a waiver of any default which may have heretofore occurred or which may hereafter occur with respect to the Loan Documents.

2.     Definitions. Any capitalized term not specifically defined herein shall have the meaning assigned to it in the Loan Agreement.

3.     Statutory Notice. ALL OF THE LOAN DOCUMENTS, INCLUDING THE LOAN AGREEMENT AND THIS AMENDMENT, TOGETHER WITH ALL OF THE INSTRUMENTS AND WRITINGS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL EXPRESSION OF THE LOAN TRANSACTION BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR OR CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER GUARANTOR AND BANK.   BORROWER AND GUARANTOR CONFIRM THAT NO UNWRITTEN ORAL AGREEMENTS EXIST BETWEEN BORROWER GUARANTOR AND LENDER.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have caused this Amendment to by executed by their respective officers thereunto duly authorized, as of the date first above written.

BANK:

SIMMONS BANK, successor by conversion to Simmons First National Bank

By: _____

Andrea Scarpelli, Wichita Market President

First Amendment
Page 3

BORROWER:

A-OK, Inc., a Kansas corporation

By: _____
     Bruce R. Harris, President & Secretary

A-OK Enterprises, LLC, a Kansas limited liability
company

By: _____
     Bruce R. Harris, Authorized Signer

A-OK 1, LLC, a Kansas limited liability company

By: _____
     Bruce R. Harris, Authorized Signer

A-OK 2, LLC, a Kansas limited liability company

By: _____
     Bruce R. Harris, Authorized Signer

A-OK 3, LLC, a Kansas limited liability company

By: _____
     Bruce R. Harris, Manager

HEVIN, LLC, a Kansas limited liability company

By: _____
     Bruce R. Harris, Authorized Signer

"GUARANTOR"

_____
Bruce R. Harris, Individually

First Amendment
Page 4

# AMENDED AND RESTATED REVOLVING CREDIT NOTE

$4,000,000.00                                                             March 31, 2015

FOR VALUE RECEIVED, the undersigned, A-OK, INC., a Kansas corporation, A-OK ENTERPRISES, LLC, a Kansas limited liability company, A-OK 1, LLC, a Kansas limited liability company, A-OK 2, LLC, a Kansas limited liability company, A-OK 3, LLC, a Kansas limited liability company and HEVIN, LLC, a Kansas limited liability company (collectively, the "Borrower"), HEREBY PROMISE TO PAY, JOINTLY AND SEVERALLY, to the order of SIMMONS FIRST NATIONAL BANK (the "Bank"), at its Principal Office located at 12121 E. 21st Street North, Wichita, Kansas, in lawful money of the United States and in immediately available funds, the principal amount of Four Million and No/100 Dollars ($4,000,000.00) or the aggregate unpaid principal amount of this Note made to the Borrower by the Bank, whichever is less, on November 30, 2015 (the "Maturity Date"), and to pay interest (computed on the basis of a year of 360 days for the actual number of days elapsed) from the date of this Note on the unpaid principal amount of this Note, in like money, at said office, at a rate per annum equal to the Interest Rate (defined below) payable on the first (1st) day of each month, commencing April 31, 2015, and on maturity. Any amount of principal hereof which is not paid when due, whether at stated maturity, by acceleration, or otherwise, shall bear interest from the date when due until said principal amount is paid in full, payable on demand, at a rate per annum equal at all times to 5.00% above the Interest Rate.

Interest upon the outstanding principal balance of each Advance shall accrue at the greater of (i) the annual rate, floating daily, equal to the maximum Prime Rate (defined below) **plus 50 basis points,** or (ii) four percent (4.00%) per annum ("Interest Rate"). "Prime Rate" shall mean the composite "United States Prime Listing Rate" as reported in the Wall Street Journal from time to time, which, as of the date of this Note, represented the prime rate on corporate loans posted by at least 75% of the nation's 30 largest banks; provided, that if at any time the Wall Street Journal shall cease to report said United States Prime Listing Rate, then thereafter "Prime Rate" shall mean the interest rate per annum announced from time to time by Bank as its corporate base or prime rate, whether or not higher or lower rates of interest are actually charged by Bank and whether or not such corporate base or Prime Rate is announced to the general public. The Prime Rate is not necessarily the lowest, or a favored, rate of interest charged by Bank.

In addition to the principal and interest, the Note shall include, and Borrower shall pay, all Fees and Expenses. If any Fees and Expenses shall not have been paid by or on behalf of Borrower within five (5) business days after notice, Bank may, in addition to any other rights or remedies, either: (i) pay the Fees and Expenses and charge Borrower interest at the Interest Rate on the amount thereof until paid in full; or (ii) without further notice to or consent from Borrower, Bank may cause an advance to be made on the Note in such amount necessary to pay the Fees and Expenses. If any payment shall be received by Bank more than ten (10) days after it shall be due, Borrower shall pay a late charge for each such late payment equal to five percent (5.00%) of the late payment.

This Note hereby amends and restates in its entirety that certain Revolving Credit Note executed by Borrower in favor of Bank on July 31, 2013 in the original maximum principal amount of $5,000,000.00. This Note is also the "Promissory Note" referred to in the Amended and Restated Commercial Loan Agreement of even date herewith, between the Borrower Guarantor and the Bank (the "Loan Agreement"). Terms used herein which are defined in the

1


EXHIBIT
B

Loan Agreement shall have their defined meanings when used herein. This Note is subject to the terms and conditions of the Loan Agreement which are incorporated herein by reference. To the extent there may be a conflict between the provisions of this Note and the Loan Agreement, the provisions of the Loan Agreement shall prevail. Borrower shall be in default under this Note if any of the Events of Default, as defined in the Loan Agreement, shall have occurred and shall not have been cured within the time provided in the Loan Agreement. Time shall be of the essence. Upon default and during the continuance thereof, Bank may exercise any remedy set forth in the Loan Agreement including accelerating all amounts due under this Note including principal, accrued interest, and Fees and Expenses and declaring the same to be immediately due and payable without notice to Borrower. No act or omission by Bank, including any acceptance of any late payment, shall ever constitute a waiver of the right of acceleration.

Borrower and all endorsers of this Note are jointly and severally liable for the obligations set forth herein and hereby severally waive presentment for payment, notice of non-payment, protest, notice of protest, notice of intent to accelerate, notice of dishonor, and the Maturity Date may be extended without notice.

Borrower may not assign this Note to any Person without the prior written consent of Bank, and no such assignment shall release Borrower of any liability under this Note. Bank may assign, transfer, or participate all or any part of this Note without notice to or consent of Borrower. Borrower shall be liable for all attorneys' fees and costs and other Fees and Expenses incurred by Bank in the collection of any amount due under this Note. The laws of the State of Kansas shall govern this Note.

This Note is secured by the Guaranty and Security Agreement as defined in the Loan Agreement. This Note is executed as a modification only and not as a novation. All terms and conditions of the Loan Agreement, Security Agreement, and all other Loan Documents or other document of lien or encumbrance of Borrower being held by Bank, all of which are incorporated herein, shall remain in full force and effect and Borrower hereby ratifies and confirms such provisions.

[The remainder of this page is intentionally left blank.]

2

EXECUTED and DELIVERED as of March 31, 2015.

BORROWER:

A-OK, Inc., a Kansas corporation

By: _____
Bruce R. Harris, President & Secretary

A-OK Enterprises, LLC, a Kansas limited liability
company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 1, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 2, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 3, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Manager

HEVIN, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

3

## NOTE EXTENSION AGREEMENT

The parties hereto enter into this Note Extension Agreement (hereinafter "Note Extension") effective as of May 30, 2016. The parties hereto acknowledge and agree that the undersigned, A-OK, INC., a Kansas corporation, A-OK ENTERPRISES, LLC, a Kansas limited liability company, A-OK 1, LLC, a Kansas limited liability company, A-OK 2, LLC, a Kansas limited liability company, A-OK 3, LLC, a Kansas limited liability company and HEVIN, LLC, a Kansas limited liability company (collectively, the "Borrower"), are indebted to SIMMONS BANK, successor by conversion to Simmons First National Bank (hereinafter "Bank"), under the terms of a certain loan transaction in the original principal amount of $4,000,000.00, as evidenced by that certain Amended and Restated Revolving Credit Note executed by Borrower in favor of Bank (together with any and all extensions, modifications, amendments, substitutions, replacements, and renewals thereto are hereinafter collectively referred to as the "Note").

This Note Extension is subject to the terms and conditions of that certain Amended and Restated Commercial Loan Agreement between Borrower and Bank dated as of April 1, 2015 (together with any and all amendments, modifications and restatements thereto collectively referred to as the "Loan Agreement"). This Note Extension is further entitled to all the benefits and security of the Loan Agreement.

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree to modify and extend the Note so that it comes due on May 30, 2017 (the "Maturity Date"). All outstanding and unpaid principal, interest, fees, and expenses shall be due on the Maturity Date.

This Note Extension is executed as a modification only and not as a novation. Except as herein provided, all terms and conditions of the above-referenced Note, Loan Agreement, and of any other mortgage, security agreement or other document of lien or encumbrance of Borrower being held by Bank, all of which are incorporated herein, shall remain in full force and effect and Borrower hereby ratifies and confirms such provisions. If Borrower consists of more than one party, all such parties shall be jointly and severally liable and responsible for all promises, covenants, agreements and other obligations set forth herein and in the Note. Borrower hereby agrees that Bank, at its option, may extend or renew this Note.

[Signature Page Immediately Follows]

-1-

THE UNDERSIGNED PARTIES AGREE TO THE ABOVE MODIFICATION AND BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS NOTE EXTENSION, PRIOR TO EXECUTION, AND THAT IT IS CORRECT.

BORROWER:

A-OK, Inc., a Kansas corporation

By: _____
Bruce R. Harris, President & Secretary

A-OK Enterprises, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 1, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 2, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

A-OK 3, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Manager

HEVIN, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

-2-

**BANK**

SIMMONS BANK, successor by conversion to
Simmons First National Bank

By: _Andrea Scarpelli_

       Andrea Scarpelli, Regional Senior Credit
       Officer

-3-

## COMMERCIAL SECURITY AGREEMENT

### (ALL ASSETS)

THIS SECURITY AGREEMENT (the "Agreement") is dated as of July 31, 2013 by and from A-OK, INC., a Kansas Corporation, having an address of 1123 North Rock Road, Building G, Suite 300, Wichita, Kansas 67206, A-OK ENTERPRISES, LLC, a Kansas limited liability company, having an address of 1123 North Rock Road, Building G, Suite 300, Wichita, Kansas 67206, A-OK 1, LLC, a Kansas limited liability company, having an address of 1123 North Rock Road, Building G, Suite 300, Wichita, Kansas 67206, A-OK 2, LLC, a Kansas limited liability company, having an address of 1123 North Rock Road, Building G, Suite 300, Wichita, Kansas 67206, A-OK 3, LLC, a Kansas limited liability company, having an address of 1123 North Rock Road, Building G, Suite 300, Wichita, Kansas 67206, and HEVIN, LLC, a Kansas limited liability company, having an address of 1123 North Rock Road, Building G, Suite 300, Wichita, Kansas 67206 (collectively, "Borrower"), to SIMMONS FIRST NATIONAL BANK, a national banking association, having an address of 12121 E. 21st Street North, Wichita, KS 67206 ("Bank").

### RECITALS

WHEREAS, Borrower has entered into that certain Commercial Loan Agreement of even date herewith (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement") with the Bank; and

WHEREAS, as a condition to extending credit to Borrower under the Loan Agreement, the Bank has required, among other things, that Borrower execute and deliver this Agreement.

NOW THEREFORE, in consideration of foregoing recitals, which are incorporated into the operative provisions of this Agreement by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, Borrower hereby agrees as follows:

Borrower grants to Bank a continuing security interest and lien (any pledge, assignment, security interest or other lien arising hereunder is sometimes referred to herein as a "security interest") in the Collateral (as defined below) to secure payment when due, whether by stated maturity, demand, acceleration or otherwise, of all existing and future obligations ("Obligations") to the Bank of Borrower. Obligations includes without limit any and all obligations or liabilities of the Borrower to the Bank, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown; any and all obligations or liabilities for which the Borrower would otherwise be liable to the Bank were it not for the invalidity or unenforceability of them by reason of any bankruptcy, insolvency or other law, or for any other reason; any and all amendments, modifications, renewals and/or extensions of any of the above; all costs incurred by Bank in establishing, determining, continuing, or defending the validity or priority of its security interest, or in pursuing its rights and remedies under this Agreement or under any other agreement between Bank and Borrower or in connection with any proceeding involving Bank as a result of any financial accommodation to Borrower; and all other costs of collecting Obligations, including without limit attorney fees. Borrower agrees to pay Bank all such costs incurred by the Bank, immediately upon demand, and until paid all costs shall bear interest at the highest per annum rate applicable to any of the Obligations, but not in excess of the maximum rate permitted

1


EXHIBIT
C

by law. Any reference in this Agreement to attorney fees shall be deemed a reference to reasonable fees, costs, and expenses of both in-house and outside counsel and paralegals, whether or not a suit or action is instituted, and to court costs if a suit or action is instituted, and whether attorney fees or court costs are incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding or otherwise. Borrower further covenants, agrees and represents as follows:

1. **Collateral.** "Collateral" shall mean all of the following property Borrower now or later owns or has an interest in, wherever located:

   (a)   All Accounts Receivable (for purposes of this Agreement, "Accounts Receivable" consists of all accounts; general intangibles; chattel paper (including without limit electronic chattel paper and tangible chattel paper); contract rights; deposit accounts; documents; instruments; rights to payment evidenced by chattel paper, documents or instruments; health care insurance receivables; commercial tort claims; letters of credit; letter of credit rights; supporting obligations; and rights to payment for money or funds advanced or sold),

   (b)   All Inventory in all of its forms, wherever located, now or hereafter existing and raw materials and work in process therefor, finished goods thereof, and materials used or consumed in the manufacture or production thereof; goods in which the Borrower has an interest in mass or joint other interest or right of any kind (including, without limitation, goods in which the Borrower has an interest or right as consignee); and goods which are returned to or repossessed by the Borrower.

   (c)   All Equipment and Fixtures, in all its forms, wherever located, now or hereafter existing.

   (d)   All Software (for purposes of this Agreement, "Software" consists of all (i) computer programs and supporting information provided in connection with a transaction relating to the program, and (ii) computer programs embedded in goods and any supporting information provided in connection with a transaction relating to the program whether or not the program is associated with the goods in such a manner that it customarily is considered part of the goods, and whether or not, by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods, and whether or not the program is embedded in goods that consist solely of the medium in which the program is embedded),

   (e)   Specific items listed below and/or on attached Schedule A, if any, is/are also included in Collateral:

   (h)   All goods, instruments, documents, policies and certificates of insurance, deposits, money, investment property or other property (except real property which is not a fixture) which are now or later in possession or control of Bank, or as to which Bank now or later controls possession by documents or otherwise, and

   (i)   All additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind (including but not

2

limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Borrower.

In the definition of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

2. **Warranties, Covenants and Agreements.** Borrower warrants, covenants and agrees as follows:

(a) Borrower shall furnish to Bank, in form and at intervals as Bank may request, any information Bank may reasonably request and allow Bank to examine, inspect, and copy any of Borrower's books and records. Borrower shall, at the request of Bank, mark its records and the Collateral to clearly indicate the security interest of Bank under this Agreement.

(b) At the time any Collateral becomes, or is represented to be, subject to a security interest in favor of Bank, Borrower shall be deemed to have warranted that (a) Borrower is the lawful owner of the Collateral and has the right and authority to subject it to a security interest granted to; (b) none of the Collateral is subject to any security interest other than that in favor of Bank; (c) there are no financing statements on file, other than in favor of Bank; (d) no person, other than Bank, has possession or control (as defined in the Uniform Commercial Code) of any Collateral of such nature that perfection of a security interest may be accomplished by control; and (e) Borrower acquired its rights in the Collateral in the ordinary course of its business.

(c) Borrower will keep the Collateral free at all times from all claims, liens, security interests and encumbrances other than those in favor of Bank. Borrower will not, without the prior written consent of Bank, sell, transfer or lease, or permit to be sold, transferred or leased, any or all of the Collateral, except for Inventory in the ordinary course of its business and will not return any Inventory to its supplier. Bank or its representatives may at all reasonable times inspect the Collateral and may enter upon all premises where the Collateral is kept or might be located.

(d) Borrower will do all acts and will execute or cause to be executed all writings requested by Bank to establish, maintain and continue an exclusive, perfected and first security interest of Bank in the Collateral. Borrower agrees that Bank has no obligation to acquire or perfect any lien on or security interest in any asset(s), whether realty or personalty, to secure payment of the Obligations, and Borrower is not relying upon assets in which the Bank may have a lien or security interest for payment of the Obligations.

(e) Borrower will pay within the time that they can be paid without interest or penalty all taxes, assessments and similar charges, which at any time are or may become a lien, charge, or encumbrance upon any Collateral, except to the extent contested in good faith and bonded in a manner satisfactory to Bank. If Borrower fails to pay any of these taxes, assessments, or other charges in the time provided above,

3

Bank has the option (but not the obligation) to do so and Borrower agrees to repay all amounts so expended by Bank immediately upon demand, together with interest at the highest lawful default rate which could be charged by Bank on any Obligations.

(f) Borrower will keep the Collateral in good condition and will protect it from loss, damage, or deterioration from any cause. In the case of any loss or damage to the Collateral Borrower will, as quickly as practicable, after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith which are necessary or desirable to such end. Borrower shall promptly furnish to Bank a statement respecting any loss or damage to any of the Collateral. Borrower has and will maintain at all times (a) with respect to the Collateral, insurance under an "all risk" policy against fire and other risks customarily insured against, and (b) public liability insurance and other insurance as may be required by law or reasonably required by Bank, all of which insurance shall be in amount, form and content, and written by companies as may be satisfactory to Bank, containing a lender's loss payable endorsement acceptable to Bank. Borrower will deliver to Bank immediately upon demand evidence satisfactory to Bank that the required insurance has been procured. If Borrower fails to maintain satisfactory insurance, Bank has the option (but not the obligation) to do so and Borrower agrees to repay all amounts so expended by Bank immediately upon demand, together with interest at the highest lawful default rate which could be charged by Bank on any Obligations.

(g) On each occasion on which Borrower evidences to Bank the account balances on and the nature and extent of the Accounts Receivable, Borrower shall be deemed to have warranted that except as otherwise indicated (a) each of those Accounts Receivable is valid and enforceable without performance by Borrower of any act; (b) each of those account balances are in fact owing, (c) there are no setoffs, recoupments, credits, contra accounts, counterclaims or defenses against any of those Accounts Receivable, (d) as to any Accounts Receivable represented by a note, trade acceptance, draft or other instrument or by any chattel paper or document, the same have been endorsed and/or delivered by Borrower to Bank, (e) Borrower has not received with respect to any Account Receivable, any notice of the death of the related account Borrower, nor of the dissolution, liquidation, termination of existence, insolvency, business failure, appointment of a receiver for, assignment for the benefit of creditors by, or filing of a petition in bankruptcy by or against, the account Borrower, and (f) as to each Account Receivable, except as may be expressly permitted by Bank to the contrary in another document, the account Borrower is not an affiliate of Borrower, the United States of America or any department, agency or instrumentality of it, or a citizen or resident of any jurisdiction outside of the United States. Borrower will do all acts and will execute all writings requested by Bank to perform, enforce performance of, and collect all Accounts Receivable. Borrower shall neither make nor permit any modification, compromise or substitution for any Account Receivable without the prior written consent of Bank. Borrower shall, at Bank's request, arrange for verification of Accounts Receivable directly with account Borrowers or by other methods acceptable to Bank.

4

(h) Borrower at all times shall be in strict compliance with all applicable laws, including without limit any laws, ordinances, directives, orders, statutes, or regulations an object of which is to regulate or improve health, safety, or the environment ("Environmental Laws").

(i) If Bank, acting in its sole discretion, redelivers Collateral to Borrower or Borrower's designee for the purpose of (a) the ultimate sale or exchange thereof; or (b) presentation, collection, renewal, or registration of transfer thereof; or (c) loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with it preliminary to sale or exchange; such redelivery shall be in trust for the benefit of Bank and shall not constitute a release of Bank's security interest in it or in the proceeds or products of it unless Bank specifically so agrees in writing. If Borrower requests any such redelivery, Borrower will deliver with such request a duly executed financing statement in form and substance satisfactory to Bank. Any proceeds of Collateral coming into Borrower's possession as a result of any such redelivery shall be held in trust for Bank and immediately delivered to Bank for application on the Obligations. Bank may (in its sole discretion) deliver any or all of the Collateral to Borrower, and such delivery by Bank shall discharge Bank from all liability or responsibility for such Collateral. Bank, at its option, may require delivery of any Collateral to Bank at any time with such endorsements or assignments of the Collateral as Bank may request.

(j) At any time and without notice, Bank may (a) cause any or all of the Collateral to be transferred to its name or to the name of its nominees; (b) receive or collect by legal proceedings or otherwise all dividends, interest, principal payments and other sums and all other distributions at any time payable or receivable on account of the Collateral, and hold the same as Collateral, or apply the same to the Obligations, the manner and distribution of the application to be in the sole discretion of Bank; (c) enter into any extension, subordination, reorganization, deposit, merger or consolidation agreement or any other agreement relating to or affecting the Collateral, and deposit or surrender control of the Collateral, and accept other property in exchange for the Collateral and hold or apply the property or money so received pursuant to this Agreement; and (d) take such actions in its own name or in Borrower's name as Bank, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the Uniform Commercial Code) over any Collateral of such nature that perfection of Bank's security interest may be accomplished by control.

(k) Bank may assign any of the Obligations and deliver any or all of the Collateral to its assignee, who then shall have with respect to Collateral so delivered all the rights and powers of Bank under this Agreement, and after that Bank shall be fully discharged from all liability and responsibility with respect to Collateral so delivered.

(l) Except as a result of the intentional conduct or gross negligence of Bank, its agents and employees, Borrower shall defend, indemnify and hold harmless Bank, its employees, agents, shareholders, affiliates, officers, and directors from and against any and all claims, damages, fines, expenses, liabilities or causes of action

5

of whatever kind, including without limit consultant fees, legal expenses, and attorney fees, suffered by any of them as a direct or indirect result of any actual or asserted violation of any law, including, without limit, Environmental Laws, or of any remediation relating to any property required by any law, including without limit Environmental Laws.

3.    **Collection of Proceeds**.

(a)    Borrower agrees to collect and enforce payment of all Collateral until Bank shall direct Borrower to the contrary. Immediately upon notice to Borrower by Bank and at all times after that, Borrower agrees to fully and promptly cooperate and assist Bank in the collection and enforcement of all Collateral and to hold in trust for Bank all payments received in connection with Collateral and from the sale, lease or other disposition of any Collateral, all rights by way of suretyship or guaranty and all rights in the nature of a lien or security interest which Borrower now or later has regarding Collateral. Immediately upon and after such notice, Borrower agrees to (a) endorse to Bank and immediately deliver to Bank all payments received on Collateral or from the sale, lease or other disposition of any Collateral or arising from any other rights or interests of Borrower in the Collateral, in the form received by Borrower without commingling with any other funds, and (b) immediately deliver to Bank all property in Borrower's possession or later coming into Borrower's possession through enforcement of Borrower's rights or interests in the Collateral. Borrower irrevocably authorizes Bank or any Bank employee or agent to endorse the name of Borrower upon any checks or other items which are received in payment for any Collateral, and to do any and all things necessary in order to reduce these items to money. Bank shall have no duty as to the collection or protection of Collateral or the proceeds of it, nor as to the preservation of any related rights, beyond the use of reasonable care in the custody and preservation of Collateral in the possession of Bank. Borrower agrees to take all steps necessary to preserve rights against prior parties with respect to the Collateral. Nothing in this Section 3, Subsection (a) shall be deemed a consent by Bank to any sale, lease or other disposition of any Collateral.

4.    **Defaults, Enforcement and Application of Proceeds.**

(a)    Upon the occurrence of any of the following events (each an "Event of Default"), Borrower shall be in default under this Agreement:

(i)    Any failure to pay the Obligations or any other Obligations when due, or such portion of it as may be due, by acceleration or otherwise; or

(ii)    Any failure or neglect to comply with, or breach of or default under, any term of this Agreement, the Loan Agreement or any other agreement or commitment between Borrower and Bank; or

(iii)    Any warranty, representation, financial statement, or other information made, given or furnished to Bank by or on behalf of Borrower shall be, or shall prove to have been, false or materially misleading when made, given, or furnished; or

6

(iv) Any loss, theft, substantial damage or destruction to or of any Collateral, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any Collateral or of any other judicial process of, upon or in respect of Borrower or any Collateral; or

(v) Sale or other disposition by Borrower of any substantial portion of its assets or property or voluntary suspension of the transaction of business by Borrower; or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Borrower; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of Borrowers by or against Borrower; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of Borrower; or

(vi) A default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Obligations.

(b) Upon the occurrence of any Event of Default, Bank may at its discretion and without prior notice to Borrower declare any or all of the Obligations to be immediately due and payable, and shall have and may exercise any one or more of the following rights and remedies:

(i) Exercise all the rights and remedies upon default, in foreclosure and otherwise, available to secured parties under the provisions of the Uniform Commercial Code and other applicable law;

(ii) Institute legal proceedings to foreclose upon the lien and security interest granted by this Agreement, to recover judgment for all amounts then due and owing as Obligations, and to collect the same out of any Collateral or the proceeds of any sale of it;

(iii) Institute legal proceedings for the sale, under the judgment or decree of any court of competent jurisdiction, of any or all Collateral; and/or

(iv) Personally or by agents, attorneys, or appointment of a receiver, enter upon any premises where Collateral may then be located, and take possession of all or any of it and/or render it unusable; and without being responsible for loss or damage to such Collateral, hold, operate, sell, lease, or dispose of all or any Collateral at one or more public or private sales, leasings or other disposition, at places and times and on terms and conditions as Bank may deem fit, without any previous demand or advertisement; and except as provided in this Agreement, all notice of sale, lease or other disposition, and advertisement, and other notice or demand, any right or equity of redemption, and any obligation of a prospective purchaser or lessee to inquire as to the power and authority of Bank to sell, lease, or otherwise dispose of the Collateral or as to the application by Bank of the proceeds of sale or otherwise, which would

7

otherwise be required by, or available to Borrower under, applicable law are expressly waived by Borrower to the fullest extent permitted.

At any sale pursuant to this Section 4, Subsection (b), whether under the power of sale, by virtue of judicial proceedings or otherwise, it shall not be necessary for Bank or a public officer under order of a court to have present physical or constructive possession of Collateral to be sold. The recitals contained in any conveyances and receipts made and given by Bank or the public officer to any purchaser at any sale made pursuant to this Agreement shall, to the extent permitted by applicable law, conclusively establish the truth and accuracy of the matters stated (including, without limit, as to the amounts of the principal and interest on the Obligations, the accrual and nonpayment of it and advertisement and conduct of the sale); and all prerequisites to the sale shall be presumed to have been satisfied and performed. Upon any sale of any Collateral, the receipt of the officer making the sale under judicial proceedings or of Bank shall be sufficient discharge to the purchaser for the purchase money, and the purchaser shall not be obligated to see to the application of the money. Any sale of any Collateral under this Agreement shall be a perpetual bar against Borrower with respect to that Collateral. At any sale or other disposition of Collateral pursuant to this Section 4, Subsection (b), Bank disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including without limit a disclaimer of any warranty relating to title, possession, quiet enjoyment or the like, and Bank may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable.

(v)     Borrower shall at the request of Bank, notify the account debtors or obligors of Bank's security interest in the Collateral and direct payment of it to Bank. Bank may, itself, upon the occurrence of any Event of Default so notify and direct any account debtor or obligor. At the request of Bank, whether or not an Event of Default shall have occurred, Borrower shall immediately take such actions as Bank shall request to establish exclusive control (as defined in the Uniform Commercial Code) by Bank over any Collateral which is of such a nature that perfection of a security interest may be accomplished by control.

(vi)    The proceeds of any sale or other disposition of Collateral authorized by this Agreement shall be applied by Bank first upon all expenses authorized by the Uniform Commercial Code and all reasonable attorney fees and legal expenses incurred by Bank; the balance of the proceeds of the sale or other disposition shall be applied in the payment of the Obligations, first to interest, then to principal, then to remaining Obligations and the surplus, if any, shall be paid over to Borrower or to such other person(s) as may be entitled to it under applicable law. Borrower shall remain liable for any deficiency, which it shall pay to Bank immediately upon demand. Borrower agrees that Bank shall be under no obligation to accept any no cash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable. If Bank

8

agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Bank may ascribe any commercially reasonable value to such proceeds. Without limiting the foregoing, Bank may apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Bank.

(c)      Nothing in this Agreement is intended, nor shall it be construed, to preclude Bank from pursuing any other remedy provided by law for the collection of the Obligations or for the recovery of any other sum to which Bank may be entitled for the breach of this Agreement by Borrower. Nothing in this Agreement shall reduce or release in any way any rights or security interests of Bank contained in any existing agreement between Borrower and Bank.

(d)      No waiver of default or consent to any act by Borrower shall be effective unless in writing and signed by an authorized officer of Bank. No waiver of any default or forbearance on the part of Bank in enforcing any of its rights under this Agreement shall operate as a waiver of any other default or of the same default on a future occasion or of any rights.

(e)      Borrower (a) irrevocably appoints Bank or any agent of Bank (which appointment is coupled with an interest) the true and lawful attorney of Borrower (with full power of substitution) in the name, place and stead of, and at the expense of, Borrower and (b) authorizes Bank or any agent of Bank, in its own name, at Borrower's expense, to do any of the following, as Bank, in its sole discretion, deems appropriate:

    (i)      To demand, receive, sue for, and give receipts or acquittances for any moneys due or to become due on any Collateral (including without limit to draft against Collateral) and to endorse any item representing any payment on or proceeds of the Collateral;

    (ii)      To execute and file in the name of and on behalf of Borrower all financing statements or other filings deemed necessary or desirable by Bank to evidence, perfect, or continue the security interests granted in this Agreement; and

    (iii)      To do and perform any act on behalf of Borrower permitted or required under this Agreement.

(f)      Upon the occurrence of an Event of Default, Borrower also agrees, upon request of Bank, to assemble the Collateral and make it available to Bank at any place designated by Bank, which is reasonably convenient to Bank and Borrower.

(g)      The following shall be the basis for any finder of fact's determination of the value of any Collateral which is the subject matter of a disposition giving rise to a calculation of any surplus or deficiency under the Uniform Commercial Code: (a) the Collateral which is the subject matter of the disposition shall be valued in an "'as is" condition as of the date of the disposition, without any assumption or

9

expectation that such Collateral will be repaired or improved in any manner; (b) the valuation shall be based upon an assumption that the transferee of such Collateral desires a resale of the Collateral for cash promptly (but no later than 30 days) following the disposition; (c) all reasonable closing costs customarily borne by the seller in commercial sales transactions relating to property similar to such Collateral shall be deducted including, without limitation, brokerage commissions, tax prorations, attorneys' fees, whether inside or outside counsel is used, and marketing costs; ( d) the value of the Collateral which is the subject matter of the disposition shall be further discounted to account for any estimated holding costs associated with maintaining such Collateral pending sale (to the extent not accounted for in (c) above), and other maintenance, operational and ownership expenses; and (e) any expert opinion testimony given or considered in connection with a determination of the value of such Collateral must be given by persons having at least 5 years experience in appraising property similar to the Collateral and who have conducted and prepared a complete written appraisal of such Collateral taking into consideration the factors set forth above. The "value" of any such Collateral shall be a factor in determining the amount of proceeds which would have been realized in a disposition to a transferee other than a secured party, a person related to a secured party or a secondary obligor under the Uniform Commercial Code.

5. **Miscellaneous.**

    (a)    Until Bank is advised in writing by Borrower to the contrary, all notices, requests and demands required under this Agreement or by law shall be given to, or made upon, Borrower at the first address indicated in Section 5, Subsection (o) below.

    (b)    Borrower will give Bank not less than 30 days prior written notice of all contemplated changes in Borrower's name, location, chief executive office, principal place of business, and/or location of any Collateral, but the giving of this notice shall not cure any Event of Default caused by this change.

    (c)    Bank assumes no duty of performance or other responsibility under any contracts contained within the Collateral.

    (d)    Bank has the right to sell, assign, transfer, negotiate or grant participations or any interest in, any or all of the Obligations and any related obligations, including without limit this Agreement. In connection with the above, but without limiting its ability to make other disclosures to the full extent allowable, Bank may disclose all documents and information which Bank now or later has relating to Borrower, the Obligations or this Agreement, however obtained. Borrower further agrees that Bank may provide information relating to this Agreement or relating to Borrower to the Bank's parent, affiliates, subsidiaries, and service providers.

    (e)    In addition to Bank's other rights, any Obligations owing from Bank to Borrower can be set off and applied by Bank on any Obligations at any time(s) either before or after maturity or demand without notice to anyone. Any such action shall not constitute an acceptance of collateral in discharge of the Obligations.

    (f)    Borrower, to the extent not expressly prohibited by applicable law or as may be

required to be given under the provisions of the Loan Agreement between Borrower and Bank or any of the Loan Documents defined therein, waives any right to require the Bank to: (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from Borrower or any other person, or otherwise comply with the provisions of the Uniform Commercial Code; or (c) pursue any other remedy in the Bank's power. Borrower waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Obligations, any and all other notices to which the undersigned might otherwise be entitled, and diligence in collecting any Obligations, and agree(s) that the Bank may, once or any number of times, modify the terms of any Obligations, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Obligations, or permit Borrower to incur additional Obligations, all without notice to Borrower and without affecting in any manner the unconditional obligation of Borrower under this Agreement. Borrower unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of Borrower under this Agreement, and acknowledges that such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from Borrower now or later securing the Obligations, and acknowledges that as of the date of this Agreement no such defense or setoff exists.

(g)     Borrower waives any and all rights (whether by subrogation, indemnity, reimbursement, or otherwise) to recover from Borrower any amounts paid or the value of any Collateral given by Borrower pursuant to this Agreement until the Obligations is paid in full.

(h)     In the event that applicable law shall obligate Bank to give prior notice to Borrower of any action to be taken under this Agreement, Borrower agrees that a written notice given to Borrower at least ten days before the date of the act shall be reasonable notice of the act and, specifically, reasonable notification of the time and place of any public sale or of the time after which any private sale, lease, or other disposition is to be made, unless a shorter notice period is reasonable under the circumstances. A notice shall be deemed to be given under this Agreement when delivered to Borrower or when placed in an envelope addressed to Borrower and deposited, with postage prepaid, in a post office or official depository under the exclusive care and custody of the United States Postal Service or delivered to an overnight courier. The mailing shall be by overnight courier, certified, or first class mail.

(i)     Notwithstanding any prior revocation, termination, surrender, or discharge of this Agreement in whole or in part, the effectiveness of this Agreement shall automatically continue or be reinstated in the event that any payment received or credit given by Bank in respect of the Obligations is returned, disgorged, or rescinded under any applicable law, including, without limitation, bankruptcy or insolvency laws, in which case this Agreement, shall be enforceable against

Borrower as if the returned, disgorged, or rescinded payment or credit had not been received or given by Bank, and whether or not Bank relied upon this payment or credit or changed its position as a consequence of it. In the event of continuation or reinstatement of this Agreement, Borrower agrees upon demand by Bank to execute and deliver to Bank those documents which Bank determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of Borrower to do so shall not affect in any way the reinstatement or continuation.

(j)    This Agreement and all the rights and remedies of Bank under this Agreement shall inure to the benefit of Bank's successors and assigns and to any other holder who derives from Bank title to or an interest in the Obligations or any portion of it, and shall bind Borrower and the heirs, legal representatives, successors, and assigns of Borrower. Nothing in this Agreement shall be deemed a consent by Bank to any assignment by Borrower.

(k)    If there is more than one Borrower, all undertakings, warranties and covenants made by Borrower and all rights, powers and authorities given to or conferred upon Bank are made or given jointly and severally.

(l)    Except as otherwise provided in this Agreement, all terms in this Agreement have the meanings assigned to them in Article 9 (or, absent definition in Article 9, in any other Article) of the Uniform Commercial Code, as those meanings may be amended, revised or replaced from time to time. "Uniform Commercial Code" means the Uniform Commercial Code applicable in Kansas. Notwithstanding the foregoing, the parties intend that the terms used herein which are defined in the Uniform Commercial Code have, at all times, the broadest and most inclusive meanings possible. Accordingly, if the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the Uniform Commercial Code in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning. If the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the Uniform Commercial Code in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

(m)    No single or partial exercise, or delay in the exercise, of any right or power under this Agreement, shall preclude other or further exercise of the rights and powers under this Agreement. The unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement. This Agreement constitutes the entire agreement of Borrower and Bank with respect to the subject matter of this Agreement. No amendment or modification of this Agreement shall be effective unless the same shall be in writing and signed by Borrower and an authorized officer of Bank. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Kansas, without regard to conflict of laws principles.

(n)    To the extent that any of the Obligations is payable upon demand, nothing contained in this Agreement shall modify the terms and conditions of that

12

Obligations nor shall anything contained in this Agreement prevent Bank from making demand, without notice and with or without reason, for immediate payment of any or all of that Obligations at any time(s), whether or not an Event of Default has occurred.

(o)   Borrower represents and warrants that Borrower's exact name and address is the name and address set forth in this Agreement.

(p)   A carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement under the Uniform Commercial Code and may be filed by Bank in any filing office.

(q)   This Agreement shall be terminated only by the filing of a termination statement in accordance with the applicable provisions of the Uniform Commercial Code, but the obligations contained in Section 2(l) of this Agreement shall survive termination.

6.   BORROWER AND BANK ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE OBLIGATIONS.

[Signature Page Immediately Follows]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by its respective officers thereunto duly authorized, as of the date first above written.

A-OK INC., a Kansas corporation

By: _____
Bruce R. Harris, President & Secretary

State of Kansas          §
                         §
County of Sedgwick       §

On July 30__, 2013, before me personally appeared **Bruce R. Harris**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the President and Secretary of **A-OK, INC.** and that by his signature on the instrument the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Kansas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]                          _____
                                Notary Public

My Commission expires:

_4 - 2 2 - 1 7_

LAVETTA A. SHAFFER
Notary Public - State of Kansas
My Appt. Expires

14

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by its respective officers thereunto duly authorized, as of the date first above written.

A-OK ENTERPRISES, LLC, a Kansas limited liability company

By: _____

Bruce R. Harris, Authorized Signer

State of Kansas       §
                               §
County of Sedgwick   §

On July 3⁰, 2013, before me personally appeared **Bruce R. Harris**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the Authorized Signer of **A-OK ENTERPRISES, LLC** and that by his signature on the instrument the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Kansas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public

My Commission expires:

4 - 22 - 17

LAVETTA A. SHAFFER
Notary Public - State of Kansas
My Appt. Expires

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by its respective officers thereunto duly authorized, as of the date first above written.

A-OK 1, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

State of Kansas       §
                       §
County of Sedgwick    §

On July 30, 2013, before me personally appeared **Bruce R. Harris**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the Authorized Signer of **A-OK 1, LLC** and that by his signature on the instrument the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Kansas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]

Lavetta a Shaffer
Notary Public

My Commission expires:

4-22-17

LAVETTA A. SHAFFER
Notary Public - State of Kansas
My Appt. Expires

16

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by its respective officers thereunto duly authorized, as of the date first above written.

A-OK 2, LLC, a Kansas limited liability company

By: _____

Bruce R. Harris, Authorized Signer

State of Kansas      §
                      §
County of Sedgwick      §

On July 30, 2013, before me personally appeared **Bruce R. Harris**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the Authorized Signer of **A-OK 2, LLC** and that by his signature on the instrument the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Kansas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public

My Commission expires:

4-22-17

LAVETTA A. SHAFFER
Notary Public - State of Kansas
My Appt. Expires

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by its respective officers thereunto duly authorized, as of the date first above written.

A-OK 3, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Manager

| | |
|---|---|
| State of Kansas | § |
| | § |
| County of Sedgwick | § |

On July 30, 2013, before me personally appeared **Bruce R. Harris**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the Manager of **A-OK 3, LLC** and that by his signature on the instrument the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Kansas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]                          _____
                                Notary Public

My Commission expires:

4-22-17

LAVETTA A. SHAFFER
Notary Public - State of Kansas
My Appt. Expires

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by its respective officers thereunto duly authorized, as of the date first above written.

HEVIN, LLC, a Kansas limited liability company

By: _____
Bruce R. Harris, Authorized Signer

State of Kansas      §
                    §
County of Sedgwick    §

On July 30, 2013, before me personally appeared **Bruce R. Harris**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the Authorized Signer of **HEVIN, LLC** and that by his signature on the instrument the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Kansas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public

My Commission expires:

4 - 22 -17
_____

LAVETTA A. SHAFFER
Notary Public - State of Kansas
My Appt. Expires

4

FILED BY KS SOS
08-05-2013
11:15:29 AM
FILE#: 7017312

0450    01
061    001
$20.00        1
PAGES: 00004

03608078

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | |

Simmons First National Bank
 Attn: Sharyl Nelson
 12121 E. 21st Street North
 Wichita, KS 67206

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME  A-OK, INC. | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS  1223 North Rock Road, Building G, Suite 300 | CITY  Wichita | STATE  KS | POSTAL CODE  67206 | COUNTRY  USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME  Simmons First National Bank | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS  12121 E. 21st Street North | CITY  Wichita | STATE  KS | POSTAL CODE  67206 | COUNTRY  USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit A.

| | | |
|---|---|---|
| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative | |
| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer | ☐ Bailee/Bailor ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA: | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Adm

EXHIBIT

D

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
**A-OK, INC.**

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME **A-OK ENTERPRISES, LLC** | | | |
|---|---|---|---|
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS **1223 North Rock Road, Building G, Suite 300** | CITY **Wichita** | STATE **KS** POSTAL CODE **67206** | COUNTRY **USA** |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME **A-OK 1, LLC** | | | |
|---|---|---|---|
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS **1223 North Rock Road, Building G, Suite 300** | CITY **Wichita** | STATE **KS** POSTAL CODE **67206** | COUNTRY **USA** |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME **A-OK 2, LLC** | | | |
|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS **1223 North Rock Road, Building G, Suite 300** | CITY **Wichita** | STATE **KS** POSTAL CODE **67206** | COUNTRY **USA** |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS(S) | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

24. MISCELLANEOUS:

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

**18. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| A-OK, INC. |

OR

| 18b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**19. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| A-OK 3, LLC | | | | |
| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1223 North Rock Road, Building G, Suite 300 | Wichita | KS | 67206 | USA |

**20. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HEVIN, LLC | | | | |
| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1223 North Rock Road, Building G, Suite 300 | Wichita | KS | 67206 | USA |

**21. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**22.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**23.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**24. MISCELLANEOUS:**

## EXHIBIT "A"

All of the following property now owned or later acquired by Debtors, wherever located: all accounts (including without limit health care insurance receivables), chattel paper (including without limit tangible and electronic chattel paper), commercial tort claims, contract rights, deposit accounts, documents, equipment, fixtures, general intangibles (including without limit payment intangibles and software), instruments, inventory (including without limit returns and repossessions), letter of credit rights, supporting obligations, and all additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind and records (including without limit computer software) pertaining to the foregoing property, and all products and proceeds of any foregoing (whether cash or non-cash proceeds), including without limit insurance and condemnation proceeds. A reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral. All terms herein have the meanings assigned to them in the Uniform Commercial Code, as those meanings may be amended, revised or replaced from time to time. "Uniform Commercial Code" means the Uniform Commercial Code applicable to Kansas, as amended, revised or replaced from time to time. The terms used herein which are defined in the Uniform Commercial Code shall have, at all times, the broadest and most inclusive meanings possible.

# GUARANTY

**Wichita, Kansas**                                    **Effective July 31, 2013**

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce SIMMONS FIRST NATIONAL BANK (herein, with its participants, successors and assigns, called "Bank"), at its option, at any time or from time to time to make loans or extend other accommodations to or for the account of A-OK, INC., a Kansas corporation, A-OK ENTERPRISES, LLC, a Kansas limited liability company, A-OK 1, LLC, a Kansas limited liability company, A-OK 2, LLC, a Kansas limited liability company, A-OK 3, LLC, a Kansas limited liability company and HEVIN, LLC, a Kansas limited liability company (herein collectively called "Borrower") or to engage in any other transactions with Borrower, the Undersigned hereby absolutely and unconditionally guarantees to Bank the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Bank (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several; all such debts, liabilities and obligations being hereinafter collectively referred to as the "Indebtedness"). The term "Indebtedness" as used in this guaranty shall include any obligations entered into between Borrower and Bank after the date hereof (including any extensions, renewals or replacement of such obligations).

The Undersigned further acknowledges and agrees with Bank that:

1.      No act or thing need occur to establish the liability of the Undersigned hereunder, and no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate the Undersigned or modify, reduce, limit or release the liability of the Undersigned hereunder.

2.      This is an absolute, unconditional and continuing guaranty of payment of the Indebtedness and shall continue to be in force and be binding upon the Undersigned, whether or not all Indebtedness is paid in full, until this guaranty is revoked by written notice actually received by the Bank, and such revocation shall not be effective as to Indebtedness existing or committed for at the time of actual receipt of such notice by the Bank, or as to any renewals, extensions and refinancings thereof. If there be more than one Undersigned, such revocation shall be effective only as to the one so revoking. The death or incompetence of the Undersigned shall not revoke this guaranty, except upon actual receipt of written notice thereof by Bank and then only as to the decedent or the incompetent and only prospectively, as to future transactions, as herein set forth.

3.      If the Undersigned shall be dissolved, shall die, or shall be or become insolvent (however defined) or revoke this guaranty, then the Bank shall have the right to declare immediately due and payable, and the Undersigned will forthwith pay to the Bank, the full amount of all Indebtedness, whether due and payable or unmatured. If the Undersigned voluntarily commences or there is commenced involuntarily against the Undersigned a case under the United States Bankruptcy Code, the full amount of all Indebtedness, whether due and payable or unmatured, shall be immediately due and payable without demand or notice thereof.

The liability of the Undersigned hereunder shall be for the entire amount of the Indebtedness, plus accrued interest thereon and all attorneys' fees, collection costs and enforcement expenses referable thereto. Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the Undersigned hereunder. The Bank may apply any sums received by or available to Bank on account of the Indebtedness from Borrower or



EXHIBIT

_E_

any other person (except the Undersigned), from their properties, out of any collateral security or from any other source to payment of the excess. Such application of receipts shall not reduce, affect or impair the liability of the Undersigned hereunder.

4. The Undersigned will pay or reimburse Bank for all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Bank in connection with the protection, defense or enforcement of this guaranty in any litigation or bankruptcy or insolvency proceedings.

5. Whether or not any existing relationship between the Undersigned and Borrower has been changed or ended and whether or not this guaranty has been revoked, Bank may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Indebtedness, without any consent or approval by the Undersigned and without any notice to the Undersigned. The liability of the Undersigned shall not be affected or impaired by any of the following acts or things (which Bank is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or approval by the Undersigned): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Indebtedness; (ii) any one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness; (iii) any waiver, adjustment, forbearance, compromise or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness; (iv) any full or partial release of, settlement with, or agreement not to sue, Borrower or any other guarantor or other person liable in respect of any Indebtedness; (v) any discharge of any evidence of Indebtedness or the acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any release, modification, substitution, discharge, impairment, deterioration, waste, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Indebtedness or any evidence thereof; (ix) any order of application of any payments or credits upon Indebtedness; (x) any election by the Bank under section 1111 (b)(2) of the United States Bankruptcy Code.

6. The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Undersigned will not assert, plead or enforce against Bank any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any Indebtedness, or any setoff available against Bank to Borrower or any such other person, whether or not on account of a related transaction. The Undersigned expressly agrees that the Undersigned shall be and remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The undersigned shall remain obligated, to the fullest extent permitted by law, to pay such amounts as though the Borrower's obligations had not been discharged.

7. The Undersigned further agrees that the Undersigned shall be and remain obligated to pay Indebtedness even though any other person obligated to pay Indebtedness, including Borrower, has such obligation discharged in bankruptcy or otherwise discharged by law. "Indebtedness" shall include post bankruptcy petition interest and attorneys' fees and any other amounts which Borrower is discharged from paying or which do not otherwise accrue to Indebtedness due to Borrower's discharge, and the Undersigned shall remain obligated to pay such amounts as though Borrower's obligations had not been discharged.

8.     If any payment applied by Bank to Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of Borrower or any other obligor), the Indebtedness to which such payment was applied shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such application, and this guaranty shall be enforceable as to such Indebtedness as fully as if such application had never been made.

9.     The Undersigned waives any claim, remedy or other right which the Undersigned may now have or hereafter acquire against Borrower or any other person obligated to pay Indebtedness arising out of the creation or performance of the Undersigned's obligation under this guaranty, including, without limitation, any right of subrogation, contribution, reimbursement, indemnification, exoneration, and any right to participate in any claim or remedy the Undersigned may have against the Borrower, collateral, or other party obligated for Borrower's debts, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

10.     The Undersigned waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing Indebtedness. Bank shall not be required first to resort for payment of the Indebtedness to Borrower or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Indebtedness, before enforcing this guaranty.

11.     The liability of the Undersigned under this guaranty is in addition to and shall be cumulative with all other liabilities of the Undersigned to Bank as guarantor or otherwise, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

12.     This guaranty shall be enforceable against each person signing this guaranty, even if only one person signs and regardless of any failure of other persons to sign this guaranty. If there be more than one signer, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each of every particular and shall be fully binding upon and enforceable against either, any or all the Undersigned. This guaranty shall be effective upon delivery to Bank, without further act, condition or acceptance by Bank, shall be binding upon the Undersigned and the heirs, representatives, successors and assigns of the Undersigned and shall insure to the benefit of Bank and its participants, successors and assigns. Any invalidity or unenforceability of any provision or application of this guaranty shall not affect other lawful provisions and application hereof, and to this end the provisions of this guaranty are declared to be severable. Except as authorized by the terms herein, this guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the Undersigned and Bank. This guaranty shall be governed by the laws of the State of Kansas. Each of the parties consents to the exclusive jurisdiction of the courts of the State of Kansas, County of Sedgwick (and of the appropriate appellate courts) in any action or proceeding seeking to enforce any provision of this guaranty or seeking any remedy in connection with the transactions contemplated by this guaranty and waives any objection to venue laid therein.

13.     The Undersigned waives notice of Bank's acceptance hereof.

14.     The Undersigned is not insolvent as defined in any applicable state or federal statutes, nor will the Undersigned be rendered insolvent by the execution and delivery of this guaranty to Bank.

15.     This Guaranty may not be amended without the written agreement of all Guarantors.

18.     This guaranty is unsecured.

3

IN WITNESS WHEREOF, this guaranty has been duly executed by the Undersigned the day and year first above written.

_____
Bruce R. Harris

STATE OF KANSAS          )
                         ) ss
COUNTY OF SEDGWICK       )

The foregoing instrument was acknowledged before me this 30 day of July, 2013, by Bruce R. Harris.


_____
Notary Public

Commission Expires:
4 - 22 - 17

LAVETTA A. SHAFFER
Notary Public - State of Kansas
My Appt. Expires

| | June 1st-4th | June 5th-11th | June 12th-18th | June 19th-25th | June 26th-30th | June Total | Orig June Budget |
|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | |
| Pawn Interest | $ 15,500 | 36,167 | 36,167 | 36,167 | 31,000 | 155,000 | 155,000 |
| Retail Sales | 40,000 | 93,333 | 93,333 | 93,333 | 80,000 | 400,000 | 400,000 |
| Scrap Gold | 7,500 | 17,500 | 17,500 | 17,500 | 15,000 | 75,000 | 75,000 |
| Financial Services | 7,500 | 17,500 | 17,500 | 17,500 | 15,000 | 75,000 | 75,000 |
| Miscellaneous Income | 500 | 1,167 | 1,167 | 1,167 | 1,000 | 5,000 | 5,000 |
| Rent Income | 600 | 1,400 | 1,400 | 1,400 | 1,200 | 6,000 | 6,000 |
| Total Income | 71,600 | 167,067 | 167,067 | 167,067 | 143,200 | 716,000 | 716,000 |
| **Cost of Goods Sold:** | | | | | | | |
| Retail Goods | 18,400 | 42,933 | 42,933 | 42,933 | 36,800 | 184,000 | 184,000 |
| Scrap Gold | 4,125 | 9,625 | 9,625 | 9,625 | 8,250 | 41,250 | 41,250 |
| Jewelry Repairs and Miscellaneous | 1,000 | 2,333 | 2,333 | 2,333 | 2,000 | 10,000 | 10,000 |
| Total Cost of Goods Sold | 23,525 | 54,892 | 54,892 | 54,892 | 47,050 | 235,250 | 235,250 |
| Gross Profit (carry forward) | $ 48,075 | 112,175 | 112,175 | 112,175 | 96,150 | 480,750 | 480,750 |

untant's compilation report and summary of significant accounting assumptions.

EXHIBIT

F

| | June 1st-4th | June 5th-11th | June 12th-18th | June 19th-25th | June 26th-30th | June Total | Orig June Budget |
|---|---|---|---|---|---|---|---|
| Gross Profit (continued) | $ 48,075 | 112,175 | 112,175 | 112,175 | 96,150 | 480,750 | 480,750 |
| **Expenses:** | | | | | | | |
| Wages | | | 120,000 | | 120,000 | 240,000 | 240,000 |
| Rent | 10,000 | 39,945 | 22,000 | 22,055 | | 94,001 | 87,000 |
| Professional Fees: | | | | | | | |
| Hinkle Law | 6,296 | | 4,796 | 4,796 | 4,111 | 20,000 | 20,000 |
| Larson & Company | 7,546 | 18,877 | 4,752 | 4,752 | 4,073 | 40,000 | 40,000 |
| Depew, Gillen, Rathbun & McInteer | | 11,138 | 3,862 | | | 15,000 | 15,000 |
| Morris Anderson (Appraiser) | | | | 30,000 | | 30,000 | 30,000 |
| Roger Eastwood | | 5,000 | | | | 5,000 | 5,000 |
| Less Trust Fund Withdrawls | (13,842) | (30,015) | (13,411) | (39,549) | (8,184) | (105,000) | |
| Utilities | 672 | 5,422 | | 18,906 | | 25,000 | 25,000 |
| Payroll Taxes | | | 12,600 | | 12,500 | 25,200 | 25,200 |
| Bank Interest | | | | 18,000 | | 18,000 | 18,000 |
| Employee Benefits | 1,800 | | 8,000 | | 8,000 | 17,800 | 16,000 |
| Software | 50 | 458 | | 13,542 | 3,322 | 17,372 | 15,800 |
| Bank/Title/E-Commerce Fees | 699 | 3,876 | 3,876 | 3,876 | 3,178 | 15,505 | 15,000 |
| Miscellaneous Expenses | 3,010 | 3,708 | 3,708 | 3,708 | | 14,134 | 15,000 |
| Advertising | 2,109 | | | 8,990 | 7,891 | 18,990 | 12,000 |
| Insurance (excluding benefits) | 607 | | | | | 607 | 10,000 |
| Building Repairs | 105 | | 3,448 | | 3,447 | 7,000 | 5,000 |
| Supplies | | 2,197 | | 2,196 | 6,000 | 10,393 | 7,000 |
| Real Estate Taxes | 25 | 901 | 901 | 901 | 772 | 3,500 | 6,000 |
| Contract Labor | - | | | | | - | 3,500 |
| Manager Commissions | - | | | | | - | - |
| Total Expenses | 19,077 | 61,506 | 174,532 | 92,174 | 165,210 | 512,500 | 610,500 |
| Net Income and Selected Expenses | $ 28,998 | 50,669 | (62,357) | 20,001 | (69,060) | (31,750) | (129,750) |

See accountant's compilation report and summary of significant accounting assumptions.

A-OK Enterprises, LLC
Forecasted Schedule of Income and Selected Expenses
June 2017 - December 2017

| Variance to orig budget | July 1st-2nd | July 3rd-9th | July 10th-16th | July 17th-23rd | July 24th-30th | July 31st | July Total | Orig July Budget | Variance to Orig. Budget | August |
|---|---|---|---|---|---|---|---|---|---|---|
| (0) | 10,968 | 38,387 | 38,387 | 38,387 | 38,387 | 5,484 | 170,000 | 170,000 | (0) | 180,000 |
| 0 | 30,968 | 108,387 | 108,387 | 108,387 | 108,387 | 15,484 | 480,000 | 480,000 | (0) | 450,000 |
| - | 7,097 | 24,839 | 24,839 | 24,839 | 24,839 | 3,548 | 110,000 | 110,000 | - | 120,000 |
| - | 4,839 | 16,935 | 16,935 | 16,935 | 16,935 | 2,419 | 75,000 | 75,000 | 0 | 70,000 |
| (0) | 323 | 1,129 | 1,129 | 1,129 | 1,129 | 161 | 5,000 | 5,000 | 0 | 5,000 |
| - | 387 | 1,355 | 1,355 | 1,355 | 1,355 | 194 | 6,000 | 6,000 | (0) | 6,000 |
| (0) | 54,581 | 191,032 | 191,032 | 191,032 | 191,032 | 27,290 | 846,000 | 846,000 | - | 831,000 |
| 0 | 14,245 | 49,858 | 49,858 | 49,858 | 49,858 | 7,123 | 220,800 | 220,800 | 0 | 207,000 |
| - | 3,903 | 13,661 | 13,661 | 13,661 | 13,661 | 1,952 | 60,500 | 60,500 | - | 66,000 |
| 0 | 645 | 2,258 | 2,258 | 2,258 | 2,258 | 323 | 10,000 | 10,000 | 0 | 10,000 |
| 0 | 18,794 | 65,777 | 65,777 | 65,777 | 65,777 | 9,397 | 291,300 | 291,300 | 0 | 283,000 |
| (0) | 35,787 | 125,255 | 125,255 | 125,255 | 125,255 | 17,894 | 554,700 | 554,700 | (0) | 548,000 |

See accountant's compilation report and summary of significant accounting assumptions.

A-OK Enterprises, LLC
Forecasted Schedule of Income and Selected Expenses
June 2017 - December 2017

| Variance to orig. budget | July 1st-2nd | July 3rd-9th | July 10th-16th | July 17th-23rd | July 24th-30th | July 31st | July Total | Orig July Budget | Variance to Orig. Budget | August |
|---|---|---|---|---|---|---|---|---|---|---|
| (0) | 35,787 | 125,255 | 125,255 | 125,255 | 125,255 | 17,894 | 554,700 | 554,700 | (0) | 548,000 |
| | | | 115,000 | | 115,000 | | 230,000 | 230,000 | - | 220,000 |
| (7,001) | 10,000 | 31,500 | 22,000 | 22,055 | | | 85,555 | 87,000 | 1,445 | 87,000 |
| 0 | 1,290 | 4,516 | 4,516 | 4,516 | 4,516 | 645 | 20,000 | 20,000 | - | 15,000 |
| (0) | 968 | 3,387 | 3,387 | 3,387 | 3,387 | 484 | 15,000 | 15,000 | - | 5,000 |
| (0) | 968 | 3,387 | 3,387 | 3,387 | 3,387 | 484 | 15,000 | 15,000 | - | 10,000 |
| - | | | | | | | - | - | - | - |
| | | 5,000 | | | | | 5,000 | 5,000 | - | 3,000 |
| 105,000 | (3,226) | (11,290) | (11,290) | (11,290) | (7,903) | 1,613 | (43,387) | | 43,387 | |
| 0 | | 10,000 | | 20000 | | | 30,000 | 30,000 | - | 30,000 |
| - | | | 12,075 | | 12,075 | | 24,150 | 24,150 | - | 23,100 |
| - | | | | 18,000 | | | 18,000 | 18,000 | - | 18,000 |
| 0 | | | 8,000 | | 8,000 | | 16,000 | 16,000 | - | 16,000 |
| - | 1,800 | 500 | | 13,500 | | | 15,800 | 15,800 | - | 15,800 |
| (0) | 968 | 3,387 | 3,387 | 3,387 | 3,387 | 484 | 15,000 | 15,000 | - | 15,000 |
| 0 | 968 | 3,387 | 3,387 | 3,387 | 3,387 | 484 | 15,000 | 15,000 | - | 15,000 |
| 0 | | 3,010 | | 8,990 | | | 12,000 | 12,000 | - | 10,500 |
| 0 | | | | | 10,000 | | 10,000 | 10,000 | - | 10,000 |
| 0 | | 4,500 | | 4,500 | | | 9,000 | 9,000 | - | 9,000 |
| - | | 1,750 | 1,750 | 1,750 | 1,750 | | 7,000 | 7,000 | - | 7,000 |
| - | | | | | | 6,000 | 6,000 | 6,000 | - | 6,000 |
| - | 226 | 790 | 790 | 790 | 790 | 113 | 3,500 | 3,500 | - | 3,500 |
| | | 250 | 250 | 250 | 250 | | 1,000 | 1,000 | - | 2,000 |
| 98,000 | 13,961 | 64,075 | 166,640 | 96,610 | 158,027 | 10,306 | 509,618 | 554,450 | 44,832 | 520,900 |
| (98,000) | 21,826 | 61,180 | (41,385) | 28,645 | (32,772) | 7,587 | 45,082 | 250 | (44,832) | 27,100 |

See accountant's compilation report and summary of significant accounting assumptions.

| | September | October | November | December | Total |
|---|---|---|---|---|---|
| | 192,000 | 195,000 | 190,000 | 190,000 | 1,272,000 |
| | 400,000 | 400,000 | 550,000 | 700,000 | 3,380,000 |
| | 110,000 | 90,000 | 110,000 | 180,000 | 795,000 |
| | 70,000 | 70,000 | 75,000 | 75,000 | 510,000 |
| | 5,000 | 5,000 | 5,000 | 5,000 | 35,000 |
| | 6,000 | 6,000 | 6,000 | 6,000 | 42,000 |
| | 783,000 | 766,000 | 936,000 | 1,156,000 | 6,034,000 |
| | | | | | |
| | 184,000 | 184,000 | 253,000 | 322,000 | 1,554,800 |
| | 60,500 | 49,500 | 60,500 | 99,000 | 437,250 |
| | 10,000 | 10,000 | 10,000 | 10,000 | 70,000 |
| | 254,500 | 243,500 | 323,500 | 431,000 | 2,062,050 |
| | | | | | |
| | 528,500 | 522,500 | 612,500 | 725,000 | 3,971,950 |

See accountant's compilation report and summary of significant accounting assumptions.

| September | October | November | December | Total |
|---|---|---|---|---|
| 528,500 | 522,500 | 612,500 | 725,000 | 3,971,950 |
| 200,000 | 200,000 | 220,000 | 220,000 | 1,530,000 |
| 87,000 | 87,000 | 87,000 | 87,000 | 614,556 |
| 15,000 | 15,000 | 10,000 | 10,000 | 105,000 |
| 5,000 | 5,000 | 5,000 | 5,000 | 80,000 |
| 10,000 | 10,000 | 5,000 | 5,000 | 70,000 |
| - | - | - | - | 30,000 |
| 3,000 | 3,000 | 3,000 | 3,000 | 25,000 |
| | | | | (148,387) |
| 25,000 | 20,000 | 20,000 | 20,000 | 170,000 |
| 21,000 | 21,000 | 23,100 | 23,100 | 160,650 |
| 18,000 | 18,000 | 18,000 | 18,000 | 126,000 |
| 16,000 | 16,000 | 16,000 | 16,000 | 112,000 |
| 15,800 | 15,800 | 15,800 | 15,800 | 110,600 |
| 15,000 | 15,000 | 15,000 | 15,000 | 105,000 |
| 15,000 | 15,000 | 15,000 | 15,000 | 105,000 |
| 10,500 | 15,000 | 15,000 | 18,000 | 93,000 |
| 10,000 | 10,000 | 10,000 | 10,000 | 70,000 |
| 6,000 | 6,000 | 8,000 | 8,000 | 51,000 |
| 7,000 | 7,000 | 7,000 | 7,000 | 49,000 |
| 6,000 | 6,000 | 6,000 | 6,000 | 42,000 |
| 3,500 | 3,500 | 3,500 | 3,500 | 24,500 |
| 1,500 | 1,500 | 3,000 | 5,000 | 14,000 |
| 490,300 | 489,800 | 505,400 | 510,400 | 3,538,918 |
| 38,200 | 32,700 | 107,100 | 214,600 | 433,032 |

See accountant's compilation report and summary of significant accounting assumptions.

# Payday Advance Multi-Store Report

**A-OK 1 LLC - Loc: 1**
**1547 S. OLIVER**
**Wichita , KS 67218**
**5/1/2017 To 5/31/2017 - All Locations**
**Login: VM - Run @ 6/8/2017 11:29**

## Outstanding As Of 6/8/2017

**Payday Advance**

| Location | Count | Principal | Intrst(fee) | Total | Average Principal |
|---|---|---|---|---|---|
| 1 | | | | | |
| 3 | | | | | |
| 12 | | | | | |
| 15 | | | | | |
| Total | | | | | |

**Payment Plans**

| Location | Count | | | Total | |
|---|---|---|---|---|---|
| 1 | | | | | |
| 3 | | | | | |
| 12 | | | | | |
| Total | | | | | |

**Payday Advances Cashed**

| Location | Count | Principal | Intrst(fee) | Total | Average Principal |
|---|---|---|---|---|---|
| 1 | | | | | |
| 3 | | | | | |
| 12 | | | | | |
| 15 | | | | | |
| Total | | | | | |

**Payday Advance Buybacks, Rollovers, Buydowns Deposits and Redeposits**

| Location | Count | Principal | Intrst(fee) | Total | Average Principal |
|---|---|---|---|---|---|
| 1 | | | | | |
| 3 | | | | | |
| 12 | | | | | |
| 15 | | | | | |
| Total | | | | | |



EXHIBIT

tabbies

G

From: Billy Haywood
Sent: Thursday, June 08, 2017 11:59 AM
To: Mazella Harris <mharris@edison.com>
Subject: Pawn Daily Financials - Amidon

## Bravo Business Intelligence
### Store Performance

| | CYTD Actual | PYTD Actual | Yesterday - 6/7 | JUN/17 | MAY/17 | APR/17 | MAR/17 | FEB/17 | JAN/17 | DEC/16 | NOV/16 | OCT/16 | SEP/16 | AUG/16 | JUL/16 | JUN/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. New Loans | | | | | | | | | | | | | | | | |
| 2. Loans Renewed | | | | | | | | | | | | | | | | |
| 3. Loans Redeemed | | | | | | | | | | | | | | | | |
| 4. Loans Defaulted | | | | | | | | | | | | | | | | |
| 5. Ending Loan Balance | | | | | | | | | | | | | | | | |
| 6. Loans Outstanding | | | | | | | | | | | | | | | | |
| 7. Avg $ Loans Outstanding | | | | | | | | | | | | | | | | |
| 8. Avg $ New Loans Made | | | | | | | | | | | | | | | | |
| 9. Avg $ Loans Defaulted | | | | | | | | | | | | | | | | |
| 10. Ending Layaway Balance | | | | | | | | | | | | | | | | |
| 11. Annual Default Trend Rate | | | | | | | | | | | | | | | | |
| 12. Total Pawn Service Charges | | | | | | | | | | | | | | | | |
| 13. Pawn Service Charges (Extension/Renewals) | | | | | | | | | | | | | | | | |
| 14. Pawn Service Charges (Redemptions) | | | | | | | | | | | | | | | | |
| 15. Pawn Yield | | | | | | | | | | | | | | | | |
| 16. Customer Purchases (Buys) | | | | | | | | | | | | | | | | |
| 17. Avg $ Customer Purchases (Buys) | | | | | | | | | | | | | | | | |

19. Retail Sales

20. Retail Gross Profit

21. Retail Gross Profit Percent

22. Scrap Gold Income

23. Scrap Gold GP %

24. Net Revenue (Pawn Service Charges, Retail, Scrap)

© 2013 by Bravo Systems LLC. All rights reserved

## Management Summary Report

### Checks Cashed

| | Count | Average | Total |
|---|---|---|---|
| Checks: | | | |
| Fee: | | | |
| Deposited: | | | |
| # Reversed: | | | |

**Current Status of Checks Cashed**
- # Bounced:
- # Deposited: 3
- *Cash flow* 1,378

### New Customers

New Customers: 157
These customers did the following transactions

| | Count | Average |
|---|---|---|
| Payday | | |
| Checks | | |
| Title Loans | | |

### Payday Advances

| | Count | Average | Total |
|---|---|---|---|
| Payday | | | |
| Fee: | | | |
| Buybacks: | | | |
| Rollovers: | | | |
| Deposited: | | | |
| Buydowns: | | | |
| # Reversed: | | | |

**Current Status of Paydays**
- # Buybacks: 535
- # Deposited: 71
- *Inflow* # Rollover: 0
- # Open: 294
- Buydowns 0

### Payment Plan

| | Payday Pmts | Average | Total |
|---|---|---|---|
| Issued: | | | |
| Fee: | | | |
| Buybacks: | | | |
| Deposited: | | | |

### Title Loans

| | Count | Average | Total |
|---|---|---|---|
| Issued: | 0 | 0.00 | 0.00 |
| Fee: | | 0.00 | 0.00 |
| Rollovers: | 0 | 0.00 | 0.00 |
| Buydowns: | 0 | 0.00 | 0.00 |
| Buybacks: | 0 | 0.00 | 0.00 |
| # Reversed: | 0 | | 0.00 |

### Returned Items

| | Bounced | Total | Payments |
|---|---|---|---|
| Payday | 40 | | |
| Checks | 6 | | |
| Title Loans | 0 | | |
| Payment Plan | 0 | | |
| Installment Ln | 0 | | |
| Redeposits | 0 | 0 | |

### Installment Loans

| | Count | Average | Total |
|---|---|---|---|
| Issued: | 0 | 0.00 | 0.00 |
| Origination Fee: | | 0.00 | 0.00 |
| Additional Fee: | | 0.00 | 0.00 |
| Maintenance Fee: | | 0.00 | 0.00 |
| Interest: | | 0.00 | 0.00 |
| Reversed Loans: | 0 | 0.00 | 0.00 |
| Payments: | 0 | 0.00 | 0.00 |
| Reversed Payments: | 0 | 0.00 | 0.00 |

### Line of Credit

| | Count | Average | Total |
|---|---|---|---|
| Issued: | 1 | | |
| Origination Fee: | | | |
| Additional Fee: | | | |
| Maintenance Fee: | | | |
| Interest: | | | |
| Reversed Loans: | 0 | | |
| Payments: | 13 | | |
| Reversed Payments: | 0 | 0.00 | 0.00 |

*inflow*

### Daily Accrual Loans

| | Count | Average | Total |
|---|---|---|---|
| Issued: | 0 | 0.00 | |
| Origination Fee: | | 0.00 | |
| Additional Fee: | | 0.00 | |
| Maintenance Fee: | | 0.00 | |
| Interest: | | 0.00 | |
| Reversed Loans: | 0 | 0.00 | |
| Payments: | 0 | 0.00 | |
| Reversed Payments: | 0 | 0.00 | |

# Multi-Store Check Cashing Summary Report

A-OK 1 LLC - Loc: 1
1547 S. OLIVER
Wichita , KS 67218
5/1/2017 - 5/31/2017
Location: All

Login: VM - Run @ 6/8/2017 11:29

| Mo/Yr | Location | Count | Check Amt | Fee | Net Amt |
|---|---|---|---|---|---|
| May/2017 | 1 | 697 | | | |
| Total for location: 1 | | 697 items | | | |
| May/2017 | 3 | 222 | | | |
| Total for location: 3 | | 222 items | | | |
| May/2017 | 12 | 206 | | | |
| Total for location: 12 | | 206 items | | | |
| May/2017 | 15 | 253 | | | |
| Total for location: 15 | | 253 items | | | |
| Grand Totals | | 1378 items | | | |